**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| THE JAMES MADISON PROJECT | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 07-01382 (RMU) |
| CENTRAL INTELLIGENCE AGENCY | * | |
| Defendant. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff The James Madison Project ("JMP")[1] commenced this litigation pursuant to the Freedom of Information Act ("FOIA") to obtain copies of guidelines, regulations or policy memoranda pertaining to the operation of defendant Central Intelligence Agency's ("CIA") Publications Review Board ("PRB").

In the wake of the Supreme Court's ruling in <u>Snepp v. United States</u>, 444 U.S. 507 (1980), the CIA was faced with the task of creating a formalized process for reviewing manuscripts and other literary works created by current and former CIA employees – as well as contractors – that are intended for public dissemination. What emerged was the PRB, an internal administrative component charged with the responsibility of reviewing the written documents to ensure that classified information is not inadvertently disclosed while also seeking to avoid infringing upon the First Amendment rights of the writer.

---

[1] JMP (*www.jamesmadisonproject.org*) is a Washington, D.C.-based non-profit organization that was created in 1998, for the primary purpose of educating the public on issues relating to intelligence gathering and operations, secrecy policies, national security and government wrongdoing. Much of the work undertaken by JMP involves litigation under FOIA. The principles underlying the objectives of the JMP are derived from the 1997 findings of The Commission on Protecting and Reducing Government Secrecy, which are more fully discussed below.

Paradoxically, much of the inner workings of this division have remained largely shrouded from public view. It is with that in mind, and armed with the desire to provide a clear and concise understanding to CIA employees and contractors – past, present and future – of the mechanism with which they have to comply, that JMP has brought this litigation before this Court.

The CIA argues that it has conducted a reasonable search for responsive records and disclosed, either in their entirety or with redactions, all responsive records concerning which it determined disclosure would not harm national security. Furthermore, it has invoked Exemptions One, Two, Three and Five to justify both the redactions made and the records that were withheld in their entirety. From the CIA's perspective, it has done all that is necessary to comply with its obligations under FOIA and moves this Court to grant it summary judgment.

The CIA's assertions notwithstanding, the current record is insufficient to determine if its search for responsive records was adequate or if its invocation of FOIA exemptions was proper. Therefore, this Court should not grant summary judgment for the CIA but, in the alternative, permit discovery to commence.

## INTRODUCTION

The circumstances presented in this litigation cry out for recognition by this Court that, metaphorically, the Emperor has no clothes. "National Security" is an important concept within which is embodied the principle that our nation must be protected from those who would do it and its citizens proscribed harms. The concept should not, and cannot be allowed to be turned into a catch-phrase which excuses any and all forms of illegitimate secrecy in the face of both law and common sense.

**The Excessiveness Of Secrecy**

The late Senator Daniel Patrick Moynihan, long regarded as a leading scholar on issues of secrecy, served as the distinguished chair of The Commission on Protecting and Reducing Government Secrecy. The Commission's 1997 Report is widely regarded as the most important analysis of U.S. Government classification and secrecy trends published in the last four decades, and it was clear in its condemnation of secrecy for secrecy's sake. The Commission warned of the specific dangers to democracy presented by illegitimate classification:

> Excessive secrecy has significant consequences for the national interest when, as a result, policymakers are not fully informed, government is not held accountable for its actions, and the public cannot engage in informed debate. This remains a dangerous world; some secrecy is vital to save lives, bring miscreants to justice, protect national security, and engage in effective diplomacy. Yet as Justice Potter Stewart noted in his opinion in the Pentagon Papers case, *when everything is secret, nothing is secret*. Even as billions of dollars are spent each year on government secrecy, the classification and personnel security systems have not always succeeded at their core task of protecting those secrets most critical to the national security. The classification system, for example, is used too often to deny the public an understanding of the policymaking process, rather than for the necessary protection of intelligence activities and other highly sensitive matters.

Report of The Commission on Protection on Protecting and Reducing Government Secrecy xxi (GPO, 1997)("*Commission Report*")(emphasis added).

The Commission concluded that "[t]he best way to ensure that secrecy is respected, and that the most important secrets remain secret, is for secrecy to be returned to its limited but necessary role. Secrets can be protected more effectively if secrecy is reduced overall." Id. The Commission enumerated the advantages of an American democratic system that permits the withholding of information only if its publication would truly cause harm to the nation.

> Greater openness permits more public understanding of the Government's actions and also makes it more possible for the Government to respond to criticism and justify those actions. It makes free exchange of scientific information possible and encourages discoveries that foster economic growth. In addition, by allowing for a fuller understanding of the past, it provides opportunities to learn lessons from what has gone before—making it easier to resolve issues concerning the Government's past actions and helping prepare for the future.

Id. The current Executive Order 12,958 (April 17, 1995), 3 C.F.R. 333 (1996), that governs the classification of information equally supports this premise. "Protecting information critical to our Nation's security remains a priority. In recent years, however, dramatic changes have altered, although not eliminated, the national security threats that we confront. These changes provide a greater opportunity to emphasize our commitment to open Government." Id.

Despite these aphorisms, over the years federal agencies such as the CIA have consistently ignored the warnings against overclassification voiced by Justice Stewart and others, at times taking secrecy into the realm of tragic comedy. By way of illustration, some of the more humorous examples of unwarranted excessive secrecy exercised by the past several Administrations have included:

- The U.S. Army classifying a study on archery under the heading "silent, flashless weapons." David Wise THE POLITICS OF LYING 67 (Random House, 1973)("*Politics of Lying*").

- The U.S. Navy classifying a report on sharks that was derived entirely from publicly available sources, purportedly to keep the documents from falling into the possession of the Soviet Navy, but more likely to keep the information from discouraging recruitment. Id. at 67-68.

- The Joint Chiefs' classifying as "TOP SECRET" a report which criticized the gross abuses of secrecy classification at all levels in the military. SANFORD J. UNGAR, THE PAPERS & THE PAPERS 219 (Columbia Univ. Press/Morning side ed., 1989).

- The Pentagon adamantly refusing to publish information that acknowledged that NASA had sent monkeys into space, despite the fact that the Washington Zoo had

4

already identified its monkeys with a plaque praising their participation in rocket experiments in the U.S. space program. The *Washington Post* reported that the Pentagon explained it was trying to preserve the U.S. relationship with India, where certain obscure sects still practiced "monkey worship." *Politics of Lying*, at 67-68.

- The classifying of White House menus as "Top Secret." <u>Id</u>. at 70.

- Weather reports produced by an aid to General Eisenhower during World War Two still being classified even thirty years after the fact. *Commission Report*, at 52.

- Journalist and former hostage Terry Anderson being denied access to files on his capture and release. After months of waiting for a response to his requests, he did finally receive copies of his own press clips which had been kept in classified government files. <u>Id</u>.

## **PROCEDURAL BACKGROUND**

The factual and procedural background concerning JMP's FOIA request at issue in this litigation is set out in detail in the CIA's Memorandum in Support of Motion for Summary Judgment (filed May 30, 2008)("CIA's Memo"), the CIA's Declaration of Martha M. Lutz (dated May 30, 2008)("Lutz Declaration"), the CIA's Declaration of Joseph W. Lambert (dated May 27, 2008)("Lambert Declaration") and JMP's Rule 56(f) Declaration of Mark S. Zaid, Esq. ("Zaid Rule 56(f) Decl."), all of which are incorporated herein by reference.[2] The scope of JMP's request was limited to regulations and policy memoranda establishing the procedures and standards by which the PRB – which has no relation to conducting covert operations or evaluating highly-sensitive "raw" intelligence data – operates and complies with its obligations.

---

[2] The factual statements made in the CIA's Memo and the Lutz Declaration are incorporated only in relation to pages 2 through 5 and paragraphs 11 through 18, respectively, and only to the extent that they do not constitute legal characterizations and conclusions.

**ARGUMENT**

The CIA has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Waterhouse v. Dist. of Columbia, 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); see Celotex Corp., 477 U.S. at 324.

In a FOIA case, the Court exercises *de novo* review and summary judgment is only available to a defendant agency that has fully discharged its obligations under FOIA. See Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007). See also Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1350 (D.C. Cir. 1983).

**I.  THE CIA FAILED TO CONDUCT AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS AND GENUINE ISSUES OF MATERIAL FACT REMAIN PRECLUDING SUMMARY JUDGMENT AT THIS TIME**

**A. The CIA Is Unable At This Time To Demonstrate It Conducted An Adequate Search For Responsive Records**

There is no dispute regarding the overarching case law pertaining to the adequacy of an agency's search for purposes of summary judgment. The burden rests upon the defendant agency to "show beyond a material doubt that it has conducted a search

reasonably calculated to uncover all relevant documents." <u>Weisberg</u>, 705 F.2d at 1351.

<u>See also</u> <u>Campbell v. U.S. Dep't of Justice</u>, 164 F.3d 20, 27 (D.C. Cir. 1988)

("reasonableness" standard is applied to determine the adequacy of a search

methodology, consistent with congressional intent tilting the scale in favor of disclosure).

Put more succinctly, the CIA "must show that it has made a good faith effort to conduct a

search for the requested records, using methods which can be reasonably expected to

produce the information requested." <u>Oglesby v. U.S. Dep't of the Army</u>, 920 F.2d 57, 68

(D.C. Cir. 1990).

It is also undisputed that a court may rely upon agency affidavits in adjudicating the

adequacy of the search, <u>Founding Church of Scientology v. Nat'l Sec. Agency</u>, 610 F.2d

824, 836 (D.C. Cir. 1979), so long as those affidavits are detailed, nonconclusory and

submitted in good faith. <u>Goland v. CIA</u>, 607 F.2d 339, 352 (D.C. Cir. 1978); <u>Perry v.</u>

<u>Block</u>, 684 F.2d 121, 127 (D.C. Cir. 1982)(<i>per curiam</i>)(highlighting that affidavits must

shed sufficient light on "scope and method of the search conducted by the agency").

"Even if these conditions are met the requestor may nonetheless produce countervailing

evidence, and if the sufficiency of the agency's identification or retrieval procedure is

genuinely in issue, summary judgment is not in order." <u>Founding Church of Scientology</u>,

610 F.2d at 836. <u>See also</u> <u>Wilbur v. CIA</u>, 355 F.3d 675, 678 (D.C. Cir. 2004)("Likewise,

the agency's failure to turn up a particular document, or mere speculation that as yet

uncovered documents might exist, does not undermine the determination that the agency

conducted an adequate search for the requested records.").

Therefore, the central issue here is whether the specific circumstances of the case at

bar reveal "positive indications of overlooked materials", <u>Founding Church of</u>

Scientology, 610 F.2d at 837, which would have been found if the CIA had conducted a "diligent search for those documents in places in which they *might be expected to be found*." Miller v. U.S. Dep't of State, 779 F.2d 1378, 1385 (8th Cir. 1985)(emphasis added), cited with approval in Iturralde v. Comptroller of the Currency, 315 F.3d 311, 315 (D.C. Cir. 2003).

Relying upon the Lutz Declaration, the CIA asserts that since it: (1) searched for responsive records in seven different components; (2) used seven different search terms in conducting the search; and (3) revised its search in light of clarifying information provided by JMP, there does not remain any substantial doubt as to the reasonableness of the CIA's search and therefore no genuine issue of material fact exists. CIA's Memo at 8-11. The CIA's assertion to the contrary, the Lutz Declaration does not demonstrate conclusively that the CIA conducted a diligent search.

Mr. Zaid's letter dated January 17, 2008, articulates the search issues that were identified by JMP. Id. at Lutz Decl., Exhibit "E". Ms. Lutz attempted to respond to the specific concerns that JMP raised in her declaration. Lutz Decl. at ¶¶30-40. A review of those responses, however, demonstrates the deficiencies that continue to exist regarding the CIA's adequacy of search and require denial of its Motion without prejudice at this time. For one thing, quite a number of the records that JMP identified as responsive were not located.[3]  While it is true that the inability of an agency to find a particular document does not *generally* render a search inadequate, see e.g., Nation Magazine, Washington

---

[3] The concerns raised by JMP were not "purely speculative" about the existence of other documents. Ground Saucer Watch v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981). As is evidenced in JMP's letter, the identification of "missing" was based on the personal knowledge of Mr. Zaid, as well as the review of released CIA records. Zaid Rule 56(f) Decl. at ¶¶1,11, attached as Exhibit "1".

Bureau v. U.S. Customs Serv., 71 F.3d 885, 892, n.7 (D.C. Cir. 1995)(emphasis added), *in certain circumstances*, a court may place significant weight on the fact that a records search failed to turn up a particular document. See Krikorian v. Dep't of State, 984 F.2d 461, 468 (D.C. Cir. 1993)(emphasis added)(factoring documents not found by agency into court's evaluation of adequacy of search).

Most importantly, the CIA concedes that in pursuing its search of those records identified by JMP as responsive it restricted its follow-up solely to the PRB only. Lutz Decl. at ¶31. At a minimum the CIA should have also tasked the other six components that were originally identified as likely to maintain possession of responsive records. Id. at ¶28; Zaid Rule 56(f) Decl. at ¶18, attached as Exhibit "1. Additionally, there is no evidence that the CIA sought input from two former PRB Chairmen in order to obtain assistance in locating the relevant responsive records notwithstanding the fact Mr. Zaid noted in his letter that these individuals remain employed by or affiliated with the CIA. Id. at Exhibit "E"; Zaid Rule 56(f) Decl. at ¶18, attached as Exhibit "1.

Moreover, while the majority of Mr. Zaid's letter pertains to the existence of specific identified records, concerns were also raised regarding a category of records pertaining to former CIA officers Frank Snepp and Michael Scheuer, both of whom were involved in prepublication review matters that led to significant changes within the CIA PRB system. The Snepp litigation, which arose from the publication of his book *Decent Interval* (Random House, 1977), lies at the heart of the CIA's current framework for the PRB. Mr. Scheuer's publication *Imperial Hubris* (Potomac Books Inc. 2004) was the subject of significant controversy within the CIA and also led to specific changes within the PRB's processing of submitted employee writings. Zaid Rule 56(f) Decl. at ¶19 attached as

Exhibit "1". Yet not one document has been released pertaining to these matters. Nor has the CIA addressed either issue within its declarations or <u>Vaughn</u> index.

While JMP will concede that - <u>after</u> discovery has concluded - the CIA may in fact be entitled as a matter of law to summary judgment regarding the adequacy of its search, the current record – consisting of the Lutz Declaration and the <u>Vaughn</u> Index – is insufficient as a matter of fact to justify awarding summary judgment to the CIA at this time.

**B.   The CIA's Lutz Declaration and <u>Vaughn</u> Index Are Insufficient For Purposes of Summary Judgment On The Adequacy Of Search At This Time**

Agency affidavits must "explain in reasonable detail the scope and method of the search conducted by the agency [sufficient] to demonstrate compliance with the obligations imposed by the FOIA." <u>Morley v. CIA</u>, 508 F.3d 1108, 1121 (D.C. Cir. 2007), <u>quoting</u> <u>Perry</u>, 684 F.2d at 127. An affidavit that lacks the detail "necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment" will be deemed insufficient. <u>See</u> <u>Morley</u>, 508 F.3d at 1122 (rejecting as insufficient a CIA affidavit that failed to identify search terms, explain how the search was conducted in each component, or give an indication of what each component's search specifically yielded).

Admittedly, the Lutz Declaration does provide a modest degree of context regarding the search methodology used and offices searched. Lutz Decl. at ¶¶28-29. It also does describe the search methodology used in its efforts to follow up on JMP's clarifying suggestions, including – to a degree – the results of the searches. <u>Id</u>. at ¶¶30-39. JMP's specific concerns regarding the CIA's inadequate search have been addressed above. The CIA's <u>Vaughn</u> Index, for its part, fails to remedy the deficiencies of the Lutz Declaration.

See CIA's Memo, Exhibit "A" ("Ex. A"). On their face, the Lutz Declaration and the

Vaughn Index are insufficient to satisfy the CIA's burden on summary judgment, as they

singularly fail to demonstrate, as discussed above, that the CIA conducted a diligent

search that was both reasonable and adequate.

The insufficiency of the CIA's affidavits deprives this Court of an adequate context in

which to assess the reasonableness of the CIA's search and therefore justifies the denial

of the CIA's Motion for Summary Judgment ("CIA's Motion") pending the completion

of discovery or additional searches and agency review.

## II.  THE CIA'S AFFIDAVITS ARE INSUFFICIENT FOR PURPOSES OF SUMMARY JUDGMENT TO SUPPORT THE INVOCATION OF EXEMPTIONS ONE, TWO, THREE, OR FIVE

"The significance of agency affidavits in a FOIA case cannot be underestimated."

King v. Dep't of Justice, 830 F.2d 210, 218 (D.C. Cir. 1987). The rationale behind this

well-established axiom is clear and apparent given that in FOIA cases "the agency alone

possesses knowledge of the precise content of documents withheld", thereby forcing both

the FOIA requester and the court to "rely upon the agency's representations for an

understanding of the material sought to be protected." Id. In order to withhold

information an agency must provide "a relatively detailed justification, specifically

identifying the reasons why a particular exemption is relevant and correlating those

claims with the particular part of a withheld document to which they apply." Id. at 219.

See also Church of Scientology, Inc. v. Turner, 662 F.2d 784, 787 (D.C. Cir. 1980)("We

have consistently maintained that vague, conclusory affidavits, or those that merely

paraphrase the words of a statute, do not allow a reviewing judge to safeguard the

public's right of access to government records."). Most importantly, specificity is the defining requirement of the agency's affidavits. See Gardels, 689 F.2d at 1105.

The burden of demonstrating that the material in question was properly withheld commonly requires the preparation of a detailed Vaughn Index, which must "show specifically and clearly that the requested materials fall into the category of documents" that Congress has exempted. Hayden v. NSA, 608 F.2d 1381, 1390 (D.C. Cir. 1979). See also PHE, Inc. v. Dep't of Justice, 983 F.2d 248, 250 (D.C. Cir. 1993)("[A]n affidavit that contains merely a 'categorical description of redacted material coupled with a categorical indication of anticipated consequences of disclosure is clearly inadequate.'"); King, 830 F.2d at 225 ("The measure of a Vaughn Index is its descriptive accuracy, and we are willing to accept innovations in its form so long, but only so long, as they contribute to that end.").[4] Of course, the determination in the agency affidavits that the materials are exempt and that no further segregation of materials is possible must be accorded "substantial weight". See Fitzgibbon, 911 F.2d at 761-62.

The CIA has invoked Exemptions One, Two, Three and Five of the FOIA as the bases for withholding and/or redacting the responsive records.[5] CIA's Memo at 11-31. In

---

[4] The requirement regarding segregability obligates agencies to divulge all portions of documents that are not specifically exempted from disclosure by statute. See Kimberlin v. DOJ, 139 F.3d 944, 950 (D.C. Cir. 1998). See also Irons v. Gottschalk, 548 F.2d 992 (D.C. Cir. 1976), cert. denied sub nom. Irons v. Parker, 434 U.S. 965 (1977).

[5] Exemption One exempts from disclosure national security information that has been "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order." 5 U.S.C. § 552 (a)(b)(1). Exemption Two exempts from disclosure records that relate "solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(a)(b)(2). Exemption Three exempts from disclosure information that is "specifically exempt from disclosure by statute ... in such a manner as to leave no discretion on the issue, or ... establishes particular criteria for

(Continued…)

order to justify its withholdings, CIA submitted the Lambert Declaration, Lutz

Declaration and the Vaughn Index. None of these affidavits - on their own or in

combination with the others - satisfies the burden of specificity, as none provide

sufficient information to enable this Court to "make a rational decision whether the

withheld material must be produced without actually viewing the documents themselves,

as well as to produce a record that will render the District Court's decision capable of

meaningful review on appeal." Dellums v. Powell, 642 F.2d 1351, 1360 (D.C. Cir. 1980).

Therefore, the CIA's Motion must be denied and discovery permitted to assess the

appropriateness of the invocation of the exemptions.

### A. Exemption One

#### 1. *Legal Sufficiency of the Affidavits*

As with any other exemption, the CIA bears the burden of justifying the invocation of

Exemption One. See Campbell, 164 F.3d at 30. See also Coldiron v. Dep't of Justice,

310 F. Supp. 2d 44, 50 (D.D.C. 2004)(permitting challenges to agency affidavits as

"insufficient for lack of detail/specificity"). The initial threshold issue is whether the

agency has demonstrated a logical connection between the "documents at issue and the

general standards that govern the national security exemption." Id. at 53, citing Campbell,

164 F.3d at 30. An agency can not simply engage in "cut and paste", but instead must

provide – to the extent that it does not frustrate national security concerns – sufficient

detail to demonstrate a "facially reasonable concern". Coldiron, 310 F. Supp. 2d at 54.

---

(…Continued)

withholding or refers to particular types of matters to be withheld." 5 U.S.C. §
552(a)(b)(3). Exemption Five exempts from disclosure information consisting of "inter-
agency or intra-agency memorandums or letters which would not be available by law to a
party other than an agency in litigation with the agency". 5 U.S.C. § 552(a)(b)(5).

See also Campbell, 164 F.3d at 31 (finding that while it is true that "requiring too much detail in a declaration could defeat the point of the exemption, in most cases the agency should not have difficulty describing the context and nature of the withheld information without revealing its substance"). Of course, agency declarations invoking national security must be afforded "substantial weight", as the courts have stated repeatedly that they will not second-guess an agency's "facially reasonable concerns" regarding the harm disclosure may cause to national security. See Frugone v. CIA, 169 F.3d 772, 775 (D.C. Cir. 1999).

The CIA has failed to meet this burden in terms of the one document regarding which Exemption One was invoked. As expected, the CIA has raised the specter of "national security" and asserted that Document Number 1512157 – a legal memorandum from the PRB Associate Legal Advisor to the PRB – must be withheld in its entirety due to, at least in part, the existence of properly classified information within the document. See CIA's Memo at 11. See also Lutz Decl. at ¶58 ("This document contains SECRET information regarding the CIA's intelligence activities, sources, and methods."). The CIA argues that disclosure of the information would "jeopardize the CIA's liaison relationships and U.S. foreign policy by revealing CIA activities in certain foreign countries". CIA's Memo at 17.

However, an agency can not meet its burden simply by invoking the phrase "national security". Coldiron, 310 F. Supp. 2d at 53. Through its affidavits, an agency must describe with reasonable specificity the material withheld and demonstrate that it has specifically tailored its description of the harm likely to result from release to each particular redaction. See King, 830 F.2d at 223-24. The Lutz Declaration and the Vaughn

Index provide virtually identical descriptions of the allegedly-exempt information, namely that it details the "PRB's decision to prohibit publication of details surrounding specific CIA clandestine activities". Lutz Decl. at ¶58; Ex. "A" at 4. Both affidavits also state that the document "identifies specific CIA classified sources and methods and discusses how the PRB might handle a request to disclose this information". Id.

These descriptions fail to provide this Court with sufficiently specific context with which to evaluate the appropriateness of the CIA's invocation of Exemption One. Most predominantly, neither affidavit clarifies whether the document: (1) actually identifies "specific CIA clandestine activities", as opposed to simply addressing the legal conclusions regarding disclosure of details pertaining to clandestine activities in general; (2) includes information concerning "specific CIA classified sources" by way of identifying actual sources or types of information, as opposed to simply addressing them generically; or (3) includes information concerning "specific CIA classified … methods" by way of identifying actual mechanisms for gathering intelligence information, as opposed to simply addressing the procedures by which information pertaining to such mechanisms is identified as publicly releasable.

None of the CIA's legal pleadings sufficiently address the issue of "specific CIA clandestine activities". The CIA's Memorandum itself only references clandestine activities when it states that the document contains information that includes "general information regarding CIA clandestine activities". See CIA's Memo at 17. The Lutz Declaration only states that disclosure would provide "insights into CIA's past activities and clandestine operations", Lutz Decl. at ¶58, but does not explain whether those "insights" include specific identification of actual activities or operations, much less how

such insights would be gained from disclosure of a legal memorandum. It remains sufficiently unclear to what extent any actual clandestine activities - past or present - are specifically identified, let alone why such specific identification would exist in this particular document.

The affidavits also fail to provide any real context concerning the extent to which the document identifies "specific CIA classified sources". The Lutz Declaration defines "intelligence sources" as consisting of an actual "source" of information – such as a human asset – or the "kind of information or type of operational assistance the source is supplying". Id. at ¶52. However, neither the Lutz Declaration, Vaughn Index or even the CIA's Memorandum explain how – or why – a legal memorandum addressing conclusions regarding disclosure of information would specifically identify actual intelligence sources. Instead, the CIA relies upon boilerplate explanations regarding the nature of "intelligence sources" and the threat that disclosure can pose to such "sources". See CIA's Memo at 15-16, citing Lutz Decl. at ¶¶52-54.[6] No specific context is provided

---

[6] The ongoing problem of agencies relying upon boilerplate, repetitive explanations regarding Exemption One invocations has previously been addressed. In Coldiron, Judge Kennedy was quite clear in stating that "the court is not to be a wet blanket" and that its review should not be vacuous. Id., 310 F. Supp. 2d at 53. See also Id. at 52-54 (upholding the sufficiency of the FBI's affidavits only after concluding that the FBI indicated that disclosure of particular passages would make available the very criteria used by the FBI to decide what actions warranted an investigation and that disclosure would reveal the cooperation of foreign governments); Schrecker v. Dep't of Justice, 254 F.3d 162, 166 (D.C. Cir. 2001)(relating to documents identifying confidential sources, disclosure "should be expected to reveal the identity of a confidential human source or reveal the identify of a human intelligence source when the unauthorized disclosure of that source would clearly and demonstrably damage the national security interests of the United States by harming the FBI's ability to continuously recruit sources for current and future use"); Halperin v. CIA, 629 F.2d 144, 149 (D.C. Cir. 1980)(regarding the names of CIA attorneys, disclosure would "tend to reveal details of [intelligence] activities and that representatives of hostile, foreign intelligence services working in this country who, by a
(Continued…)

detailing how any actual specific "sources" are identified or how disclosure would provide foreign intelligence services with confirmation of the CIA's use of a specific "source".

Lastly, the affidavits fail to sufficiently demonstrate that the document identifies "specific CIA classified … methods", the disclosure of which could reasonably be expected to cause serious damage to the national security. To be sure, the CIA is attempting to persuade this Court that the definition of an "intelligence method" is broad enough to encompass "the means by which the CIA decides what information it can release to the public". See Id. at ¶56. From the perspective of the CIA, disclosure of that particular procedure(s) "would allow foreign intelligence services to manipulate and circumvent the rules, practices, and procedures the CIA uses when deciding whether it can release classified or sensitive information to the public without jeopardizing U.S. security". Id.

Needless to say, this position is wholly without merit. The CIA, like every other federal agency, is bound by Executive Order 13292, "Classified National Security Information" ("EO 13292"). In order to implement the directives of EO 13292 pertaining to declassification and comply with its obligations under the FOIA, the CIA has implemented – and made available to the public – internal regulations that detail the procedures and criteria by which information can identified and released pursuant to a FOIA request. See 32 C.F.R. §1900 et seq. The argument that the CIA's procedures for

---

(…Continued)
variety of techniques, can undertake courses of action to ascertain what other contacts, what other locations, and then arrive at determinations whether [the CIA's attorneys are] doing any other function for the Central Intelligence Agency")(internal quotations omitted).

declassifying and disclosing information under FOIA is somehow less sensitive than the PRB's procedures for declassifying and disclosing information quite honestly defies logic and credulity. More importantly, such procedures no more constitute an "intelligence method" than do the CIA's FOIA procedures.

  2.  *Court's Ability to Evaluate Classification Decisions*

This Court's ability to question the CIA's decision to withhold the documents under Exemptions One does not rise or fall based on the determination of the legal sufficiency of the affidavits. Following EPA v. Mink, 410 U.S. 73 (1973), Congress amended the FOIA to clarify its intent that "courts act as an independent check on challenged classification decisions." Goldberg, 818 F.2d 71, 76 (D.C. Cir. 1987). Courts are not to relinquish "their independent responsibility." Id. at 77. Nor should courts "give an agency carte blanche to redact or otherwise withhold responsive information without a valid and thorough affidavit ...." Lawyers Committee for Human Rights et al v. INS, 721 F.Supp. 552, 561 (S.D.N.Y. 1989).

Indeed, the D.C. Circuit Court of Appeals has unquestionable upheld the judiciary's ability to question an agency's Exemption One determination. In commenting on the Congressional override of resident Ford's veto of the 1974 FOIA legislation, the Court of Appeals opined that "this vote of confidence in the competence of the judiciary affirms our own belief that judges do, in fact, have the capabilities needed to consider and weigh data pertaining to the foreign affairs and national defense of this nation." Washington Post Co. v. U.S. Department of State, 840 F.2d 26, 35 (D.C. Cir. 1988), citing Zweibon v. Mitchell, 516 F.2d 594, 642-643 (1975)(en banc), cert. denied, 425 U.S. 944 (1976). Indeed, "the District Court must do more to assure itself of the factual basis and bona

fides of the agency's claim of exemption than rely solely upon an affidavit." <u>Stephenson v. IRS</u>, 629 F.2d 1140, 1145 (5th Cir. 1980)(footnote omitted).

Given, at a minimum, the insufficiency of the CIA's affidavits, summary judgment is not appropriate at this time and should be denied.

**B. Exemption Three**

Exemption Three permits withholding information that is exempted from disclosure by another statute. CIA's Memo at 18, <u>citing</u> 5 U.S.C. § 552(b)(3). JMP does not dispute that the National Security Act ("NSA Act"), as amended, and the CIA Act, as amended, qualify as withholding statutes under Exemption Three. <u>See</u> CIA's Memo at 19. <u>See also</u> 50 U.S.C. § 403-1(i)(1) (protect intelligence sources and methods from unauthorized disclosure); 50 U.S.C. § 403g (withhold intelligence sources and methods, as well as employees' personal identifiers and "internal organizational data"). The threshold issue, as the CIA itself admits, is whether the CIA's affidavits have sufficiently demonstrated that the "material withheld falls within the exemption claimed - i.e., whether it relates to intelligence sources and methods." <u>Id</u> at 18-19.

As an initial matter, the CIA continues to misconstrue the breadth of discretion that the courts have afforded to agencies invoking the NSA Act and the CIA Act. The CIA asserts that neither statute "requires the CIA to identify or describe the damage to national security that reasonably could be expected to result from unauthorized disclosure." CIA's Memo at 21, <u>citing</u> <u>Hayden</u>, 608 F.2d at 1390. To be sure, the D.C. Circuit in <u>Hayden</u> did state that "[a] specific showing of potential harm to national security, while necessary for Exemption 1, is irrelevant to the language of [the National

Security Act]".[7] Id. However, the Court did not go so far as to permit agencies to submit boilerplate, conclusory affidavits justifying the invocation of Exemption Three. See Hayden, 608 F.2d at 1390-91 (highlighting the Founding Church of Scientology ruling, in which the D.C. Circuit rejected an NSA affidavit as conclusory due to lack of specifics pertaining to the material other than "lawful signals intelligence activities" and to disclosure in that it would "reveal certain functions and activities of the NSA"). In contrast, the Circuit in Hayden upheld the sufficiency of an NSA affidavit that described the intelligence activity involved – NSA monitoring of foreign electromagnetic signals – and showed why disclosure of requested materials would reveal the nature of the activity. Id. at 1391.

None of the CIA's affidavits – either on their own or in combination with the others - satisfy the burden established in Hayden. The Lutz Declaration, for its part, first reiterates its rather expansive interpretation of the scope of the terms "intelligence sources" and "intelligence methods". See Lutz Decl. at ¶58 ("[D]efinition of 'intelligence sources' is much broader than a source's identity … '[I]ntelligence methods' also include the special practices and procedures of an intelligence agency. The National Security Act exempts the information at issue in this case because disclosure of this information could reveal the CIA's intelligence sources and/or methods."). See also Id. at ¶¶78, 80 (stating that the CIA Act exempts disclosure of intelligence sources", "intelligence methods" and employees' names and personal identifiers – among other internal data – since disclosure would reveal "CIA sources, methods, organization, functions, employee names, and

---

[7] It goes without saying that this apparent concession by the CIA that a showing of specific harm to national security is required for Exemption One invocations only strengthens the arguments JMP espoused earlier regarding the insufficiency of the CIA's affidavits in relation to the CIA's invocation of Exemption One.

official titles"). It also identifies thirteen different types of "internal data" that it argues constitute "sources" or "methods" that fall within the scope of the two withholding statutes. See Id. at ¶80. Subsequently, both the Lutz Declaration and the Lambert Declaration attempt to address the Exemption Three redactions made in seven (7) of the twenty-seven (27) "redacted-in-part" documents. Id. at ¶¶81-83; Lambert Decl. at ¶¶10-12. Neither of the two affidavits, however, addresses the three (3) "denied-in-full" documents, all of which contain Exemption Three redactions. Ex. "A" at 2-4.

At a minimum, the CIA's identification of "internal CIA regulation numbers" as falling within the scope of permissible withholdings by way of the NSA Act or CIA Act is without merit. The CIA has previously disclosed in prior, unrelated litigation before this Court a host of its internal regulation numbers, including for regulations pertaining to classified information. See e.g., Agency Regulation ("AR") 10-1, "Security Clearances, Accesses and Approvals", attached as Exhibit "2"; AR 10-16, "Appeal of Personnel Security Decisions", attached as Exhibit "3"; AR 70-5, "Declassification and Release", attached as Exhibit "4". There is nothing in any of the CIA's affidavits that adequately demonstrates how internal regulation numbers fall within the scope of either statute.

While the threat to national security by way of the "mosaic theory" arguably deserves consideration and the CIA's affidavits are afforded substantial weight, neither factor relieves the CIA of its obligation to provide sufficiently-detailed affidavits. The CIA's affidavits fail to meet the burden of demonstrating specifically how particular information falls within the scope of either withholding statute and therefore are insufficient for purposes of summary judgment.

**C. Exemption Two**

Both parties agree that Exemption Two can be invoked to protect from disclosure matters "related solely to the internal personnel rules and practices of an agency". 5 U.S.C. § 552(b)(2). A two-step test determines the applicability of the exemption: "First, the material withheld should fall within the terms of the statutory language. . . . Second, [i]f so, the agency may defeat disclosure by proving that either disclosure may risk circumvention of agency regulation, . . . or the material relates to trivial administrative matters of no genuine public interest." Morley, 508 F.3d at 1124 (internal quotations omitted).[8] There are two types of information that can be protected from disclosure, namely "high 2" information which – if released – would "risk circumvention of the law" or "low 2" information which pertains solely to "internal matters of a relatively trivial nature". CIA's Memo at 23, quoting Wiesenfelder v. Riley, 959 F. Supp. 532, 535 (D.D.C. 1997).

What is disputed is whether the CIA has met its burden – by way of its affidavits – of demonstrating that the information exempted satisfies the two-step test. After all, the exemption "does not shield information on the sole basis that it is designed for internal agency use." Fitzgibbon v. U.S. Secret Serv., 747 F. Supp. 51, 56 (D.D.C. 1990). "[A] reasonably low threshold should be maintained for determining when withheld

---

[8] In Schwaner v. Dep't of Air Force, the D.C. Circuit sought to resolve the ongoing confusion regarding the scope of information that constitutes "internal personnel rules and practices of an agency". Id. 898 F.2d 793 (D.C. Cir. 1990). The Circuit established a "predominant internality" test, and concluded that information need not actually be "rules and practice" to qualify so long as the matter "related" to rules and practices. Id. at 795. Addressing the conflicting analyses in the FOIA House and Senate Reports, the Circuit held that Exemption Two would protect "trivial rules and practices" – such as "matters of internal management" – and "nontrivial ones" – such as operating rules and procedures for investigators – whose disclosure would circumvent agency regulation. Id.

administrative material relates to significant public interests." <u>Founding Church of Scientology of Wash. v. Smith</u>, 721 F.2d 828, 830 n.4 (D.C. Cir. 1983).

*1. "High 2" Withholdings*

The CIA has chosen to argue that disclosure of allegedly-exempt information contained within four different versions of an internal handbook for CIA publication reviewers would "significantly risk circumvention of the regulations from which the information came" by way of providing a blueprint for ways to circumvent the prepublication review process. <u>See</u> CIA's Memo at 23-24, <u>citing</u> <u>Schiller v. NLRB</u>, 964 F.2d 1205, 1208 (D.C. Cir. 1992). <u>See also</u> Lutz Decl. at ¶¶71-72 (arguing that disclosure of the information "would allow a would-be author to 'game the system' and force the disclosure of classified information that could damage the national security"). It is the CIA's view, more or less, that disclosure of the information would render operationally useless the effectiveness of the prepublication review process in general, and the usefulness of the documents in particular. <u>See</u> Lutz Decl. at ¶72.[9]

This argument simply makes no logical sense. Zaid Rule 56(f) Decl. at ¶¶21-22 attached as Exhibit "1". Moreover, the CIA has failed to: 1) apply consistent standards in making redactions; and 2) sufficiently demonstrate through its affidavits that disclosure of the information would render operationally useless the prepublication review process. As the CIA has made quite clear, the "high 2" information in question relates to the CIA's internal procedures for: a) reviewing works of fiction; b) reviewing information from other agencies or foreign governments; c) handling and classifying manuscripts;

---

[9] Indeed, the CIA does not specifically identify a single federal statute or regulation that is designated with the task of preventing this type of conduct. In effect, the CIA is relying exclusively upon the notion that disclosure would render the prepublication review process operationally useless.

d) reviewing galley proofs; e) reviewing material previously disclosed; f) reviewing

publications that contain classified information available in open sources; and g)

reviewing materials intended for use in official publications. CIA's Memo at 24; Lutz

Decl. at ¶71; Ex. "A" at 15, 18, 42, 43.

First, for reasons known only by the CIA, it has failed to maintain a consistent

application of Exemption Two criteria in its redactions. For example, the CIA has already

identified the internal procedures in question here, yet in Document Number 1531053,

the CIA chose to redact even the simple identification of those procedures from the

"Table of Contents" and from the body of the document. Conversely, the CIA chose to

disclose those very same identifications in the other three versions of the handbook.

Additionally, again in Document Number 1531053, the CIA chose to disclose the entirety

of Section 2(f), which deals with assigned dates by which reviews must be completed.

Conversely, in Document Number 1531068 (an *older*, more outdated version of the

handbook), that very same section on assigned dates has been largely redacted, save the

virtually identical first sentence that reads, "Finally, the assigned dates by which reviews

must be completed are very important". On what grounds were these inconsistent

redactions on identical substantive content applied? The CIA's affidavits are silent on this

issue.

Second, the CIA's affidavits fail to provide any real concrete explanations that

identify in what manner disclosure of the allegedly-exempt information would render the

prepublication review process operationally useless. The D.C. Circuit has been quite clear

regarding the degree of specificity that it requires in agency affidavits justifying "high 2"

redactions. See e.g., PHE, Inc., 983 F.2d at 251 (disclosure of one particular page - out of

a 16 page FBI manual – detailing the sources of information available to FBI agents investigating unlawful transportation of obscene matter would provide violators with the ability to impede lawful investigations); Schiller, 964 F.2d at 1208 (disclosure of guidelines for implementing the Equal Justice Act would compromise the NLRB's ability to defend itself by way of revealing litigation strategies); National Treasury Employees Union v. United States Custom Serv., 802 F.2d 525, 530-31 (D.C. Cir. 1986)(disclosure of evaluative criteria used by USCS personnel concerning applicants for federal employment would make correct evaluation more difficult); Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1073 (D.C. Cir. 1981)(disclosure of a manual detailing law enforcement investigatory techniques would undermine agency's ability to prevent violation of statutes regulating use of alcohol, tobacco and firearms).

In contrast, the CIA's affidavits have provided nothing more than generic statements about the abstract threat that disclosure of the information would somehow permit a would-be author to "game the system" and force disclosure of classified information. See Lutz Decl. at ¶72. As an initial matter, given that the PRB only applies to former and current CIA employees and contractors who maintain or maintained security clearances with the CIA, which by its very nature indicates that the CIA itself determined that it was clearly consistent with the interests of national security that the particular individual be given access to classified information, surely there must be a presumption of good faith applied to the conduct of any of the individuals who would subsequently be submitting written manuscripts to the PRB for review. More importantly, in what manner would disclosing these particular procedures imbue even the most devious of individuals with the ability to trick the PRB's well-trained staff into not noticing the existence of classified

information – or at least information which, in conjunction with other unclassified information, might arguably become classified – in a written document? How would such an individual be in a position to "force" the disclosure of anything, let alone classified information, when the ability to publish the information is subject to the discretionary authority of the PRB? That answer remains a secret apparently known only to the CIA.

Admittedly, JMP concedes that – after discovery – some of the information may indeed fall within the scope of the high 2 exemption. However, at this juncture JMP is not required to demonstrate anything more other than that, in light of the factual record, there remains a genuine issue of material fact regarding the applicability of the exemption. See Morley, 508 F.3d at 1125. Given the insufficiency of the CIA's affidavits, JMP has met its burden, rendering meritless the argument that the CIA is entitled to summary judgment.

2.  *"Low 2" Withholdings*

The CIA has done no better with its justifications for the invocation of Exemption Two in relation to "low 2" information. The CIA seeks to withhold information concerning: "1) CIA employee identification numbers and official titles; 2) CIA employee telephone and fax numbers; 3) the names and/or numbers for internal CIA regulations, publications, Employee Bulletins, review handbooks, reports, and forms … ; 4) internal CIA organizational information, including but not limited to, component abbreviations; 5) internal procedures used by the PRB to resolve intra-PRB disagreements regarding the damage to national security that could result from the publication of sensitive information; 6) the CIA's internal policy regarding which CIA publications are exempt from the PRB regulation; 7) the CIA's internal review process

used to evaluate CIA employees' resumes; and 8) the CIA's internal policy regarding OGC's ethics review of the circumstances surrounding the release of publications by CIA employees." CIA's Memo at 25-26. The CIA asserts that such administrative matters are matters in which the public has no legitimate interest. See CIA's Memo at 25. See also Lutz Decl. at ¶64 ("The information withheld from these documents does not purport to regulate the public's activities or set standards CIA personnel must follow when deciding whether to proceed against or take action affecting members of the public.").

The CIA's affidavits, however, fail to provide an adequate context in which an assessment can be made of the appropriateness of the "low 2" withholdings. At a minimum, the Lutz Declaration's vague references to "internal organizational information" and "numbers for internal regulations" are insufficient in light of the law of this Circuit. See e.g., Morley, 508 F.3d at 1125 (rejecting as insufficient the CIA's vague references to "internal organizational data" and "internal Agency regulations and practices" and remanding for a more detailed explanation); Fitzgibbon, 747 F. Supp. at 56-57 (rejecting agency argument that disclosing identification markings and numbers would "compromise the integrity" of the recordkeeping system and holding that "agencies have no generalized interest in keeping secret the method by which they store records"); Schwaner, 898 F.2d at 798 (finding that information linked to data-collecting practices, as well as to duty assignment rules and practices, was not protected by Exemption Two).

The Vaughn Index, for its part, fails to fill in the gaps. Instead, the explanations consist largely of boilerplate recitations of the descriptions provided in the Lutz Declaration, devoid of any specific context. For example:

- MORI 1512161 – Subject: Revised Agency Regulation on Procedures for Review of Official or Nonofficial Publication – "The information withheld pursuant to FOIA exemption low (b)(2) would reveal internal personnel rules and practices and includes: a) internal CIA regulation numbers; b) CIA employees' names and signatures; c) the internal name of a CIA Web site; d) internal CIA addresses; e) internal CIA regulation, publication and form names and numbers; f) a CIA employee's telephone number; g) CIA organizational information, including component abbreviations; h) external and internal mailing addresses, fax numbers, telephone numbers, and email addresses for the PRB; i) internal procedures used by the PRB to resolve intra-PRB disagreements; j) the CIA's internal policy regarding which CIA publications are exempt from the PRB regulation; and k) the CIA's internal management and ethics review process. The information withheld pursuant to FOIA exemption low (b)(2) is predominantly internal, not of any genuine public interest, and does not purport to regulate the public's activities or set standards that CIA personnel must follow when deciding whether to proceed against or take action affecting members of the general public."

- MORI 1512162 – Subject: Executive Correspondence Routing Sheet and Memorandum – "The information withheld pursuant to FOIA exemption low (b)(2) would reveal internal personnel rules and practices, including internal CIA regulation numbers and information regarding CIA employees' official representational activities, i.e., speeches, conference participation, interviews, etc. The information withheld pursuant to FOIA exemption low (b)(2) is predominantly internal, not of any genuine public interest, and does not purport to regulate the public's activities or set standards that CIA personnel must follow when deciding whether to proceed against or take action affecting members of the general public."

Ex. "A" at 11, 13.

Furthermore, it remains the CIA's burden to establish that the information withheld is too trivial to warrant disclosure and JMP is not required to produce any dispositive evidence that there is a public interest in the information. See Morley, 508 F.3d at 1125, citing 5 U.S.C. § 552(a)(4)(B).

Given the insufficiency of the CIA's affidavits, there remains a genuine issue of material fact and summary judgment in favor of the CIA is not appropriate pending discovery.

**D. Exemption Five**

Neither party disputes that Exemption Five encompasses "inter-agency or intra-agency memorandum or letters which would not be available by law to a party … in litigation with the agency" and that the initial threshold question is whether the record qualifies as an "inter-agency or intra-agency memorandum". <u>See</u> CIA's Memo at 26-27. If the initial threshold is satisfied, the record can be withheld under Exemption Five if it would be "normally privileged in the civil discovery context". <u>NLRB v. Sears, Roebuck & Co.</u>, 421 U.S. 132, 149 (1975). The CIA asserts, and JMP does not dispute, that the attorney-client privilege, the attorney work-product doctrine, and the deliberative process privilege all qualify as privileges that would normally be found in the civil discovery context and therefore fall within the scope of Exemption Five. <u>See</u> CIA's Memo at 27, <u>citing</u> <u>NLRB</u>, 421 U.S. at 148-49.

To date, the Supreme Court has not yet defined what constitutes "inter-agency or intra-agency" documents, <u>United States v. Weber Aircraft Corp</u>, 465 U.S. 792, 798 n. 13 (1984), but the D.C. Circuit has chosen to employ a "functional rather than a literal test in assessing" whether memoranda are "inter-agency or intra-agency". <u>See</u> <u>Ryan v. Dep't of Justice</u>, 617 F.2d 781, 789-90 (D.C. Cir. 1980). With that in mind, the Lutz Declaration identified eight (8) documents as constituting "inter-agency or intra-agency" records that meet the initial threshold. Lutz Decl. at ¶85. The eight documents consist of the following:

1) a memorandum from the Chairman of the PRB to the Director of the CIA regarding revisions to CIA procedures;

2) a legal memorandum from the PRB's Associate Legal Advisor to the PRB;

3) a second legal memorandum from the PRB's Associate Legal Advisor to the PRB;

4) a memorandum concerning the designation of a Chairman of the PRB;

5) a powerpoint presentation regarding the rights and responsibilities of those who fall within the scope of the PRB;

6) a second powerpoint presentation regarding the rights and responsibilities of those who fall within the scope of the PRB;

7) an October 1991 report on the PRB by the Office of the Inspector General; and

8) an Inspection Report on the PRB by the Deputy Director for Planning & Coordination.

Ex. "A." at 2, 3, 4, 14, 22, 23, 25, 44.

JMP does not dispute that all eight documents constitute "inter-agency or intra-agency" documents. However, JMP does dispute that the CIA's affidavits have sufficiently demonstrated for purposes of summary judgment that the redactions made fall within the scope of the three evidentiary privileges. Accordingly, summary judgment is not appropriate at this time pending discovery.

## A. Deliberative Process Privilege

The basic purpose behind the deliberative process privilege, namely protecting from disclosure pre-decisional agency deliberations, is not in dispute. CIA's Memo at 27-28, citing Judicial Watch, Inc. v. Dep't of Justice, 365 F.3d 1108, 1113 (D.C. Cir. 2004). See also Dep't of Interior v. Klamath Water Users Protective Assoc., 532 U.S. 1, 8-9 (2001)("The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within

the Government.")(internal quotations and citation omitted); <u>Mead Data Cent., Inc. v.</u>

<u>United States Dep't of the Air Force</u>, 566 F.2d 242, 256 (D.C. Cir. 1977)("A decision

that certain information falls within exemption five should therefore rest fundamentally

on the conclusion that, unless protected from public disclosure, information of that type

would not flow freely within the agency."). JMP will also concede that the CIA's

ultimate judgment regarding "what confidentiality is needed 'to prevent injury to the

quality of agency decisions … while the decisionmaking process is in progress'" shall be

afforded considerable deference. CIA's Memo at 28, <u>citing</u> <u>Chemical Mfrs. Ass'n v.</u>

<u>Consumer Prod. Safety Comm'n</u>, 600 F. Supp. 114, 118 (D.D.C. 1984).

However, it is the CIA's burden, through its affidavits, to first demonstrate that the

documents are pre-decisional - as opposed to post-decisional – and that the information

reflects "deliberative or policy-making processes" – as opposed to purely factual,

investigative matters. <u>See e.g.</u> <u>Coastal States Gas Corp. v. Dep't of Energy</u>, 617 F.2d 854,

868 (D.C. Cir. 1980)("It is also clear that the agency has the burden of establishing what

deliberative process is involved, and the role played by the documents in issue in the

course of that process."); <u>Mead Data Cent., Inc.</u>, 566 F.2d at 258 (agency required to

provide "specific and detailed proof that disclosure would defeat, rather than further, the

purposes of the FOIA").[10]

For its part, the D.C. Circuit has already taken on the task of establishing a structure

by which the courts could determine if an agency's affidavits had sufficiently

---

[10] The D.C. Circuit has attempted to distinguish the "pre-decisional" and "deliberative" requirements, explaining that the two focus on different functions. <u>See</u> <u>Access Reports v. Dep't of Justice</u>, 926 F.2d 1192 (D.C. Cir. 1991). "While the 'predecisional' label clearly focuses attention on the role of the entire document in the decision-making process, the 'deliberative' criterion may be useful in distinguishing between privileged and non-privileged material within a single 'predecisional' document." <u>Id</u>. at 1195.

demonstrated both that the document was pre-decisional and the information reflected the deliberative process. See Senate of Puerto Rico ex rel. Judiciary Comm. v. Dep't of Justice, 823 F.2d 574 (D.C. Cir. 1987). "In deciding whether a document should be protected by the privilege we look to whether the document is 'predecisional' -- whether it was generated *before* the adoption of an agency policy -- and whether the document is 'deliberative' -- whether it reflects the give-and-take of the consultative process." Id. at 585 (emphasis in original). The agency affidavits have to demonstrate that the document preceded, in temporal sequence, the "decision" to which it relates. Id. Furthermore, the Circuit noted that "predecisional communications are not exempt merely because they are predecisional", but that the agency's affidavits must also establish "what deliberative process is involved, and the role played by the documents in issue in the course of that process". Id. at 585-86. See also SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1204 (D.C. Cir. 1991)("[T]he agency must describe not only the contents of the document but also enough about its context, *viz.* the agency's decisionmaking process, to establish that it is a pre-decisional part thereof. Specifically, the court needs to know whether the document explains, directly or by reference, the reason for the agency's decision.").[11]

At a minimum, the CIA's affidavits have failed to demonstrate the validity of the privilege in relation to at least two of the documents within which the CIA has redacted information by way of the deliberative process privilege. According to the Lutz Declaration, Document Numbers 1531057 and 1531058 consist of "PowerPoint

---

[11] The D.C. Circuit also identified two factors that can assist in the determination regarding the availability of the privilege: the "nature of the decisionmaking authority vested in the officer or person issuing the disputed document," and the relative positions in the agency's "chain of command" occupied by the document's author and recipient. Senate of Puerto Rico ex rel. Judiciary Comm., 823 F.2d at 586.

presentations regarding the PRB, and contain recommendations, analyses, and discussions designed to inform and/or assist in future decision-making processes". Lutz Decl. at ¶95. The Lutz Declaration fails to identify any "decision" or "policy" – if indeed any exists – to which either document pertained other than "future decision-making processes", let alone what role the documents would play in the course of those processes. The affidavit also omits, as does the <u>Vaughn</u> Index, any description of the "decisionmaking authority vested" in the authors of the documents – whose names and titles have also been redacted – as well as their position in the CIA's "chain of command". <u>Id</u>; Ex. "A" at 22-23.

### B. Attorney-Client and Work-Product Privileges

The fundamental principles underlying both the attorney-client privilege, protecting confidential communications between clients and their attorneys in relation to securing legal advice, and the attorney work-product privilege, protecting information prepared in anticipation of litigation, are not in dispute. CIA's Memo at 30, <u>citing</u> <u>Fisher v. United States</u>, 425 U.S. 391, 403 (1976); <u>FTC v. Grolier, Inc.</u>, 462 U.S. 19, 25 (1983). As always, though, the burden remains on the CIA to sufficiently demonstrate, by way of its affidavits, that the redacted information falls within the scope of either privilege.

The attorney client-privilege protects an agency's communications with its attorneys, provided that the communications are necessary to obtain informed legal advice and their disclosure is limited to those who are authorized to speak or act for the agency. <u>Coastal States Gas Corp.</u>, 617 F.2d at 862-64. The burden is on the agency to demonstrate that confidentiality was expected in the handling of the communications, and that it was

reasonably careful to keep the confidential information protected from general disclosure. Id. at 863.

For its part, the attorney work-product privilege does not extend to "materials prepared 'in the ordinary course of business or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes'". Hertzberg v. Veneman, 273 F. Supp. 2d 67, 78 (D.D.C. 2003), citing Fed. R. Civ. P. 26(b). Conversely, the litigation does not need to be "actual or imminent", but merely "fairly foreseeable". Id. See also Schiller, 964 F.2d at 1208 (holding that "some articulable claim, likely to lead to litigation, must have arisen", although a specific claim does not yet have to be contemplated). Ultimately, the "testing question" is "whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation". In re Sealed Case, 146 F.3d 881, 884 (D.C. Cir. 1998). See also Id. (arguing that the party "must at least have had a subjective belief that litigation was a real possibility, and that belief must have been *objectively reasonable*" in the circumstances)(emphasis added).

At a minimum, the CIA's affidavits fail to provide a sufficiently adequate context in which assess the extent to which Document Numbers 1512156 and 1512157 were drafted in objectively reasonable anticipation of litigation. The Lutz Declaration and the Vaughn Index generically state that the attorney drafting the two legal memoranda could reasonably anticipate litigation on the two subject matters in question, namely the CIA's compliance with the PRB's thirty day review requirement and how the CIA reviews factual material in fictional manuscripts. Lutz Decl. at ¶93; Ex. "A" at 3-4. However, neither affidavit provides any supplemental context in which to assess the attorney's

subjective belief, let alone to evaluate the objective reasonableness of that determination. Upon what basis did the PRB's Associate Legal Advisor decide that there would be reasonable foreseeable litigation on these two issues? The CIA's affidavits are silent on the issue.

In light of the insufficiency of the CIA's affidavits, summary judgment is not appropriate at this time.

### III. CIA HAS FAILED TO DEMONSTRATE THAT ALL SEGREGABLE PORTIONS OF THE RESPONSIVE RECORDS HAVE BEEN RELEASED

A Vaughn index must expressly indicate for each document that any reasonably segregable information has been disclosed. Krikorian, 984 F.2d at 467. The Court of Appeals for the District of Columbia Circuit has repeatedly held that it is reversible error for a district court not to make a finding of segregability. See e.g. Kimberlin, 139 F.3d at 950 (in remanding case for segregability determination, stating that it is reversible error for district court to fail to make segregability finding); Schiller, 964 F.2d at 1210 (same); see also Animal Legal Defense Fund v. Department of the Air Force, 44 F. Supp.2d 295, 299 (D.D.C. 1999) (chastising agency for failing to discharge "its duty under § 552(b)").

Notwithstanding the different Exemptions that might be asserted, nonexempt portions of all records must be released. See 5 U.S.C. § 552(b) (1998)(sentence immediately following exemptions). Here, CIA has done little to present any credible evidence that segregable portions of the records in question cannot be released. All it claims is that it "it determined that any non-exempt information is so inextricably interwined with the exempt information that there are no meaningful, reasonably segregable, non-exempt portions." See Lutz Decl. at ¶¶98-99.

This is completely unacceptable and contrary to law. See e.g., <u>Davin v. U.S. Dep't of Justice</u>, 60 F.3d 1043, 1052 (3d Cir. 1995)(rejecting conclusory representation on segregation when declaration failed to describe process by which segregability determinations were made and provided no "factual recitation of why certain materials are not reasonably segregable"); <u>Krikorian</u>, 984 F.2d at 466-67 (segregability requirement applies to all documents and all FOIA exemptions); <u>Bay Area Lawyers Alliance for Nuclear Arms Control v. Department of State</u>, 818 F.Supp. 1291, 1300 (N.D.Cal. 1992)("boilerplate" statement that "no segregation of non-exempt, meaningful information can be made for disclosure" deemed "entirely insufficient").

Therefore, CIA's request for summary judgment is premature and must be denied. <u>See</u> <u>Voinche v. FBI</u>, 46 F.Supp.2d 26, 33 (D.D.C. 1999)(refusing to grant summary judgment because agency's blanket segregability statement was inadequate).[12]

## IV. ALTERNATIVELY, JMP IS ENTITLED TO CONDUCT LIMITED DISCOVERY TO ASCERTAIN THE ADEQUACY OF THE CIA'S SEARCH AND THE APPROPRIATENESS OF THE CIA'S WITHHOLDINGS

Discovery is a permissible and useful tool in the proper judicial administration of the FOIA with regard to agency searches that are inadequate. See <u>Founding Church of</u>

---

[12] <u>See also</u> <u>Judicial Watch v. U.S. Dep't. of Health & Human Services</u>, 27 F.Supp.2d 240, 246 (D.D.C. 1998)("If a court is to make specific findings of segregability without conducting in camera review in every FOIA case, the government simply must provide more specific information in its <u>Vaughn</u> affidavits."). Under the circumstances, JMP has no objection to the Court undertaking an *in camera* review of the unredacted records, which is within the discretion of the Court. <u>Spirko v. United States Postal Serv.</u>, 147 F.3d 992, 996 (D.C.Cir. 1998). Furthermore, *in camera* review would clearly not impose an onerous burden on the court since there are only a limited number of records in question that likely do not encompass a significant number of pages. See <u>Carter v. U.S. Dep't of Commerce</u>, 830 F.2d 388, 393 (D.C.Cir. 1987)(number of documents and length involved is factor for consideration). In fact, given the vast experience of the Court in adjudicating numerous lawsuits involving the regulations of various federal agencies it is in a unique position to be able to compare the CIA's alleged "classified" regulations with those the Court has openly interpreted in other cases.

Scientology, 610 F.2d at 836-37 ("To accept its claim of inability to retrieve the requested documents in the circumstances presented is to raise the specter of easy circumvention of the Freedom of Information Act … and if, in the face of well-defined requests and positive indications of overlooked materials, an agency can so easily avoid adversary scrutiny of its search techniques, the Act will inevitably become nugatory."). Since in most FOIA cases the government possesses all of the relevant evidence, it is permissible to use discovery to uncover facts to determine the adequacy of the government's search or the exempt status of requested documents. See Weisberg v. Webster, 749 F.2d 864, 868 (D.C. Cir. 1984).[13] Given the insufficiency of the CIA's affidavits and the subsequent inability by CIA to demonstrate that it conducted an adequate and reasonable search, discovery is necessary and permitted.

The D.C. Circuit and this Court are arguably replete with case law that supports the notion that discovery can be required to address the insufficiency of an agency's affidavits regarding the adequacy of a search. See e.g., Oglesby, 902 F.2d at 71 (vacating district court's grant of summary judgment to defendant agency and remanding for further findings regarding adequacy of search); Weisberg, 705 F.2d at 1348 (permitting discovery to resolve material factual dispute regarding adequacy of search); Perry, 684 F.2d at 124-25 (awarding summary judgment to defendant agency only after the agency had been forced to conduct two additional searches pursuant to judicial order); Western Ctr. for Journalism v. IRS, 116 F. Supp. 2d 1, 5-6 (D.D.C. 2000)(awarding summary judgment only after defendant agency had conducted an additional search

---

[13] While the court was addressing the particular right of the government to utilize discovery, it affirmed that right by stating that the government, "like any other litigant", should be able to utilize the rules of discovery. Weisberg, 749 F.2d at 868.

subsequent to its original motion for summary judgment and released an additional 658 pages of responsive records).

The permissibility of discovery in relation to exemption claims is no different. See e.g., Tax Analysts v. IRS, 214 F.3d 179, 185 (D.C. Cir. 2000)(determining that discovery necessary to develop factual record); Schaffer v. Kissinger, 505 F.2d 389, 391 (D.C. Cir. 1974)(reversing and remanding district court's grant of summary judgment with instructions that plaintiffs be permitted to undertake discovery relating to whether the records in question had been "properly classified" in accordance with an Executive Order as is required by the terms of Exemption 1). Courts are to "require the agency to create as full a public record as possible concerning the nature of the documents and the *justification* for nondisclosure." Hayden, 608 F.2d at 1384 (emphasis added). See also Gardels, 689 F.2d at 1105 ("The test is not whether the court personally agrees in full with the [agency]'s evaluation of the danger - rather, the issue is whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility...."). If the agency's affidavits are insufficient, the Court is permitted to "conduct a detailed inquiry into whether it agrees with the agency's opinions...." Halperin, 629 F.2d at 148. At least one court has even used the opportunity to simply order the disclosure of relevant records. Powell v. United States Dep't of Justice, No. C-82-326, slip op. at 8 (N.D.Cal. Mar. 27, 1985)(district court ordered disclosure of classified information because it was "convinced [that] disclosure of this information poses no threat to national security.").

Given the previously-detailed insufficiency of the CIA's affidavits in relation to the justifications for invoking Exemptions One, Two, Three and Five, the need for discovery

on this end is both permissible and necessary. The <u>Vaughn</u> Index in particular fails to adequately "describe the injury to national security that would follow from the disclosure" of the regulations. <u>See</u> <u>Wiener v. FBI</u>, 943 F.2d 972, 980 (9th Cir.1991). It is not enough to rely "on general assertions that disclosure of certain categories of facts may result in disclosure of the source and disclosure of the source may lead to a variety of consequences detrimental to national security." <u>Id</u>. <u>See also</u> <u>Rosenfeld v. United States Dep't of Justice</u>, 57 F.3d 803, 808 (9th Cir. 1995)(same).[14]

Discovery does not need to be overly burdensome or excessive in scope. At a minimum, supplemental CIA affidavits could fill at least some of the evidentiary gaps identified by JMP. In addition, a limited number of interrogatories and depositions will be necessary to identify the full scope of responsive documents that exist and assess whether the CIA's search methodology was reasonably calculated to uncover all responsive documents in light of that information. Zaid Rule 56(f) Decl. at ¶18. Similarly limited discovery will also be necessary to ascertain the appropriateness of the CIA's invocations of Exemptions One, Two, Three and Five. <u>Id</u>.

---

[14]Moreover, the D.C. Circuit's Court of Appeals has ruled that "[a]n assurance of *procedural* compliance does not, by itself, afford an adequate foundation for de novo review of the *substantive* propriety of the withholdings in question." <u>King</u>, 830 F.2d at 226.

Date:   July 14, 2008

Respectfully submitted,

/s/

_____

Mark S. Zaid, Esq.
DC Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
(202) 454-2809
(202) 330-5610 fax
Mark@MarkZaid.com
Brad@MarkZaid.com

# EXHIBIT "1"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|                                        |     |                                    |
|----------------------------------------|-----|------------------------------------|
|                                        | *   |                                    |
| THE JAMES MADISON PROJECT              | *   |                                    |
|                                        | *   |                                    |
| Plaintiff,                             | *   |                                    |
|                                        | *   |                                    |
| v.                                     | *   | Civil Action No. 07-01382 (RMU)    |
|                                        | *   |                                    |
| CENTRAL INTELLIGENCE AGENCY            | *   |                                    |
|                                        | *   |                                    |
| Defendant.                             | *   |                                    |
|                                        | *   |                                    |

*    *    *    *    *    *    *    *    *    *    *    *

**RULE 56(f) DECLARATION OF**
**EXECUTIVE DIRECTOR MARK S. ZAID, ESQ.**

I, MARK S. ZAID, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.  I am a person over eighteen (18) years of age and competent to testify. I make this Declaration on personal knowledge and in support of the plaintiff's Opposition to Defendant's Motion for Summary Judgment (filed May 30, 2008).

2.  I am the Executive Director of the plaintiff James Madison Project ("JMP") and have served in that position since I founded the organization in 1998. JMP is a Washington, D.C.-based non-profit organization created for the primary purpose of educating the public on issues relating to intelligence gathering and operations, secrecy policies, national security and government wrongdoing. Much of the work undertaken by JMP involves litigation under disclosure acts such as the Freedom of Information Act ("FOIA"). The principles underlying the objectives of the JMP are derived from the 1997 findings of The Commission on Protecting and Reducing Government Secrecy. Our website, which contains further information and examples of JMP's activities, can be viewed at www.JamesMadisonProject.org.

3.   I am also an attorney of record in this litigation for JMP. I am admitted to practice

law in the States of New York, Connecticut, Maryland and the District of Columbia, as

well as the D.C. Circuit, Second Circuit and Fourth Circuit Court of Appeals, and the

United States District Courts for the District of Columbia, Maryland, Eastern District of

New York, Northern District of New York, Southern District of New York and the Court

of Claims. I have been litigating FOIA cases since 1993. I have been teaching the D.C.

Bar Associations CLE courses on FOIA since 2003, and I have been the co-editor of

LITIGATION UNDER THE FEDERAL OPEN GOVERNMENT LAWS since 2002.

### Procedural Background

4.   By letter dated June 26, 2007, I submitted to the Central Intelligence Agency

("CIA") on behalf of JMP a FOIA request which sought "copies of all internal CIA

documents constituting guidelines, regulations, or policy memoranda pertaining to the

creation and operation of the Publications Review Board ("PRB")."

5.   By letter dated July 4, 2007, the CIA acknowledged receipt of the request and

assigned it Request No. F-2007-01553.

6.   No further response was ever received from the CIA. As the twenty working days

time limit expired on July 26, 2007, JMP filed suit in this court on July 30, 2007.

.   9.   On November 1, 2007, I spoke with Vesper Mei, the Department of Justice

attorney representing the CIA, and we negotiated the following: (1) the CIA will

complete processing of the documents responsive to plaintiff's request and release to

plaintiff any non-exempt documents or portions of documents by January 11, 2008;

(2) the parties will confer with respect to the CIA's release (if any) of documents by

January 25, 2008; and (3) if, after conferring, the parties do not agree that the CIA's

2

release of any non-exempt documents or portions of documents resolves the issues in this case, the CIA will move for summary judgment on or before March 25, 2008.

10. By letter dated January 11, 2008, the CIA released 9 documents that had been previously withheld in their entirety in segregable form. The CIA indicated that it was withholding information from those 9 documents based upon FOIA exemptions One, Two, Three and Five. The CIA also noted that it was withholding 3 additional documents in their entirety based upon the same FOIA exemptions.

11. By letter dated January 17, 2008, based upon my review of the released records, I identified several deficiencies in the CIA's search and provided suggestions and clarifications to be used in a revised search.

12. By letter dated May 27, 2008, the CIA released 11 more documents that had been found based upon the revised search scope and methodology. All of the documents contained redactions. The CIA also released, in their entirety, six rescinded versions of the CIA's PRB regulation and, with redactions, six other rescinded versions of the PRB regulation.

13. From the CIA's filing of its Motion for Summary Judgment, the CIA claims it identified 36 responsive documents, of which 27 were partially released, 3 withheld in full and 6 released in full. Upon review of released records I determined that JMP would challenge the withholdings in several of the documents partially released, and all of the 3 records withheld in full.

## Substantive Response

14. The CIA relies on the Declaration of Joseph W. Lambert, Director, Information Management Services, Office of the Chief Information Officer (dated May 27, 2008) and

the Declaration of Martha M. Lutz, Information Review Officer (dated May 30, 2008)("Lutz Decl.") to support its withholding determinations. I have personally reviewed both documents.

15. In my private capacity as an attorney I have been representing federal employees, particularly within the Intelligence Community, for over 15 years. I can safely say that I have litigated more prepublication review challenges than anyone else. See e.g. Boening v. CIA, Civil Action No: 07-430 (D.D.C.)(EGS); Sterling v. CIA, Civil Action No: 03-0603 (D.D.C.)(TPJ); Wendy Lee v. CIA, Civil Action No. 03-0206 (D.D.C.)(TPJ); Waters v. CIA, Civil Action No: 06-383 (D.D.C.)(RBW); Stillman v. CIA 209 F. Supp. 2d 185 (D.D.C. 2002)(EGS), rev'd on other grounds, 319 F.3d 546 (D.C. Cir. 2003). I have also handled numerous administrative prepublication review challenges at multiple federal agencies, to include the CIA, over the years. My involvement in prepublication review challenges has led to my being interviewed on numerous occasions by the media to provide expert commentary on prepublication matters. See e.g., *New York Sun,* "White House Now Grows Skittish Over Iranian Demarche of 2003", December 19, 2006; *Los Angeles Times*, David Wise, "Talker, author, censor, spy; More and more intelligence officials are sharing their secrets in books, but it's the CIA that usually gets the last word", May 6, 2007;.*USA Today*, "Surge in spy-and-tell books, like Tenet's, strains CIA review board", April 30, 2007; *Publishers Weekly*, "Are Spy Books Spooking the CIA?", October 2, 2006; *New York Sun*, "Here's the Buzz on Valerie Plame: She'll Break Her Silence for $2.5M", May 11, 2006; *New York Times*, "C.I.A. Crackdown Seeks To Tighten Agency's Secrecy", April 24, 2006; *New York Times*, "Book Due Soon By Wen Ho Lee Is Causing Stir", August 5, 2001. I have also published op-ed and commentaries

4

on the topic. <u>See e.g.</u>, *Washington Times*, Muzzling the messenger, August 10, 2004, attached at Exhibit "A".

16. I have also litigated dozens of FOIA lawsuits over the last 15 years. As noted above, I have been teaching the D.C. Bar Associations CLE courses on FOIA since 2003, and I have been the co-editor of LITIGATION UNDER THE FEDERAL OPEN GOVERNMENT LAWS since 2002.

17. With respect to the issue of adequacy of search, the CIA has failed to demonstrate it has acted reasonably and processed all responsive records. In my letter dated January 17, 2008, I articulated the search issues that JMP identified as deficient. Lutz Decl., Exhibit "E". Ms. Lutz attempted to respond to the specific concerns that I raised in her declaration. <u>Id.</u> at ¶¶30-40. A review of those responses, however, demonstrates the deficiencies that continue to exist regarding the CIA's adequacy of search and require denial of its Motion without prejudice at this time. For one thing, quite a number of the records that JMP identified as responsive were not located. I did not speculate as to the existence of the specific records referenced in my letter. My information was based on a specific and personal review of released responsive records pertaining to this case. Indeed, I had to provide copies of records to the CIA, which the CIA had initially failed to identify as responsive, in order to assist the CIA in locating additional, clearly relevant, records.

18. Most importantly, the CIA concedes that in pursuing its search of those records identified by JMP as responsive it restricted its follow-up solely to the PRB only. Lutz Decl. at ¶31. At a minimum the CIA should have also tasked the other six components that were originally identified as likely to maintain possession of responsive records. <u>Id.</u>

5

at ¶28. Additionally, there is no evidence that the CIA sought input from two former PRB Chairmen – John Hollister Hedley and Scott Koch – in order to obtain assistance in locating the relevant responsive records notwithstanding the fact that I noted in my letter that these individuals, though I did not specifically name them in the letter, remain employed by or affiliated with the CIA. Id. at Exhibit "E".

19. Moreover, while my letter pertains to the existence of specific identified records I also raised concerns regarding a category of records pertaining to former CIA officers Frank Snepp and Michael Scheuer, both of whom were involved in prepublication review matters that led to significant changes within the CIA PRB system. The Snepp litigation, which arose from the publication of his book *Decent Interval* (Random House, 1977), lies at the heart of the CIA's current framework for the PRB. See *www.FrankSnepp.com*. Mr. Scheuer's publication *Imperial Hubris* (Potomac Books Inc. 2004) was the subject of significant controversy within the CIA and also led to specific changes within the PRB's processing of submitted employee writings. See Mark S. Zaid, "CIA Insider's Harsh Critique of U.S. Terror Tactics: A Review Of Imperial Hubris: Why The West Is Losing The War on Terror", *Findlaw.com*, at Exhibit "B". Yet not one document has been released pertaining to these matters. Nor has the CIA addressed either issue within its declarations or Vaughn index.

20. Because material facts, such as described above, still remain at issue, JMP should be permitted to undertake limited discovery in order to address the disputes surrounding the CIA's adequacy of search and the appropriateness of its Exemption invocations. Discovery need not be overly burdensome or excessive in scope. At a minimum, supplemental CIA affidavits could fill at least some of the evidentiary gaps identified by

JMP. In addition, a limited number of interrogatories and depositions would be helpful to assess whether the CIA's search methodology was reasonably calculated to uncover all responsive documents in light of that information.

21. Finally, given my extensive experiences with the CIA's Prepublication Review Board, I find I am compelled to respond to the CIA's argument that disclosure of allegedly-exempt information contained within four different versions of an internal handbook for CIA publication reviewers would "significantly risk circumvention of the regulations from which the information came" by way of providing a blueprint for ways to circumvent the prepublication review process. See CIA's Memo at 23-24 (citation omitted). See also Lutz Decl. at ¶¶71-72 (arguing that disclosure of the information "would allow a would-be author to 'game the system' and force the disclosure of classified information that could damage the national security"). The CIA is essentially arguing that disclosure of the information would render operationally useless the effectiveness of the prepublication review process in general and the usefulness of the documents in particular. Id. at ¶72. This argument is patently absurd, and the CIA should be pressed further to specifically elaborate to this Court how exactly such a scenario would come to pass.

22. The prepublication review process exists to ensure classified information is not inadvertently published. Former and current CIA employees/contractors and others are required, in perpetuity, to submit their writings concerning matters regarding which they had authorized access to classified information. An unequivocal First Amendment right exists to publish unclassified information except for the limited extent current employees/contractors face certain additional restrictions. There is no legitimate method

7

to "circumvent" the CIA's prepublication review process other than to refuse to comply

with the procedures that are set out in both secrecy/non-disclosure forms and the PRB's

internal regulations. If an individual were to gain access to this internal (b)(2) information

and somehow "game the system", exactly what is meant by this statement? If, for

example, the internal records reveals that certain information need not be submitted for

prepublication review than exactly how is disclosing that information to prospective

authors circumventing a system that does not require submission? Or if the information

reveals how text can be written in such a way not to be considered classified, on what

grounds would such a "manipulation" circumvent a review system that seeks to minimize

suppression? The text is legally publishable whether the CIA objects or not. Either the

information <u>is</u> considered classified and can not be published or it is <u>not</u> considered

classified and it can be published. Of course, so long as the CIA asserts the information is

classified the opinion of the author to the contrary matters not, until such time a federal

district judge says otherwise.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that

the contents of the foregoing paper are true to the best of my knowledge.

Date:   July 14, 2008

/s/

_____

Mark S. Zaid

8

# EXHIBIT "1-A"

Muzzling the messenger The Washington Times August 10, 2004 Tuesday

Copyright  2004 The Washington Times LLC
All Rights Reserved
The Washington Times

August 10, 2004 Tuesday

**SECTION:** OPED; Pg. A17

**LENGTH:** 962 words

**HEADLINE:** Muzzling the messenger

**BYLINE:** By Mark S. Zaid, SPECIAL TO THE WASHINGTON TIMES

**BODY:**

The CIA and prepublication rights

The anonymous author of "Imperial Hubris: Why the West is Losing the War on Terrorism" made headlines recently when he condemned the Bush administration's decision to invade Iraq in 2003 and lambasted policy officials for trying to create a Western-style democracy in Afghanistan. While routine cocktail-party chatter often repeated these criticisms, what made these so unique was that they originated with a current employee of the CIA.

The book's publisher noted that the "U.S. government agency at which this author is employed required that 'approval for this manuscript is predicated upon the author maintaining his anonymity and also that his association with the Agency is not disclosed'." "Mike," as he is known, is an overt 22-year-veteran CIA analyst who, according to former colleagues, served as the station chief for the bin Laden desk. Over the past few weeks, "Mike" made the rounds of national television programs, always hidden in shadow, and often provided interviews to newspaper reporters.

One senior intelligence official stated, "We would prefer officers keep their personal views personal, but we are not in position to prevent him from expressing his personal views in writing done on his own time." This is untrue. The CIA could have prevented the publication of the book without blinking an eye. According to the publisher, the CIA has now muzzled "Mike." Effective immediately, "Mike" is prohibited from giving interviews without prior written approval, and approval must be requested at least five business days in advance. "Mike" must also provide the CIA with a detailed outline of his intended statements.

There is nothing unusual about these requirements. They are completely consistent with the CIA's existing regulations. But one must still ask what led the CIA to allow publication of this book in the first place.

Every CIA employee must execute a secrecy agreement pledging, subject to civil and criminal penalties, not to disclose classified information. The agreement contains a prepublication review clause that mandates submission of all writings that bear relation to the individual's work or the CIA. This requirement extends past employment into perpetuity.

While those who work for the CIA do not relinquish their First Amendment rights entirely, they are severely curtailed. To be sure, no one has a right to publish classified information. The debate that arises is whether the information is classified. For former employees, that is the only power the CIA has to prevent publication. Sadly, this authority is routinely abused. And because the CIA has such broad authority, its determinations are virtually unassailable.

The CIA's regulations explain that the prepublication review requirement does not apply to "material that is totally unrelated to intelligence or employment matters, such as cooking, gardening, or purely domestic political matters" or material that consists "solely of personal views, opinions, or judgments on matters of public concern and does not contain or purport to contain any mention of the CIA, intelligence activities or data, or information on any topic about which the author had access to classified information."

Given the book's topic, "Mike" was required to submit his manuscript for prepublication review. Although the book did not contain classified information, the analysis does not stop there. The regulations state clearly that "for current employees and contractors, the Agency may also deny permission to publish statements or expressions of opinion that could reasonably be expected to impair the author's performance of duties, interfere with the authorized functions of the CIA, or have an adverse impact on the foreign relations or security of the United States."

Muzzling the messenger The Washington Times August 10, 2004 Tuesday

The CIA historically has sought to stifle criticism even from former directors. Adm. Stansfield Turner described the process as arbitrary and irresponsible when the CIA tried to censor portions of his "book's highly critical view of the Reagan administration's mishandling of our intelligence activities, especially its indifference to any oversight of the CIA."

Former intelligence officer, Frank Snepp, who wrote the best-seller "Decent Interval," was sued by the government. Though the CIA claimed the book did not contain classified information, it successfully obtained a civil judgment that Mr. Snepp violated his contractual obligations for failing to submit the manuscript for prepublication review. Nearly 30 years later, every royalty check Mr. Snepp earns is turned over to the government.

Even if "Mike" had sought to challenge the CIA's refusal to allow publication of his book, no court would have disagreed until at least after he had left the CIA's employ. Even then, the CIA could have delayed publication by years.

Why then did the CIA allow this manuscript to be published? Perhaps because it was the very message senior CIA officials wanted public after having failed with any effect to convey similar messages privately.

It is well known that the general criticisms presented by "Mike" are more widespread within the CIA than is publicly acknowledged. Given that the CIA does nothing willingly that it does not view as advancing its own agenda, the book's publication should not be construed as an example of the CIA's dedication to the First Amendment.

To the contrary, it was probably a parting shot to a White House fighting an increasing perception of a failed terrorism/Iraq policy or the vehicle for a still-hidden agenda. With that agenda accomplished, "Mike's" apparent usefulness to the CIA has ended, and now he has been silenced.

Mark S. Zaid is a Washington lawyer who routinely handles national security cases, including CIA prepublication review challenges.

**LOAD-DATE:** November 9, 2004

# EXHIBIT "1-B"



http://writ.news.findlaw.com/books/reviews
/20041015_zaid.html

[FILE /includes/writ/writ.news.findlaw.com/includes/breadcrumb.shtml NOT FOUND]



----

# The Surprising Publication of a CIA Insider's Harsh Critique of U.S. Terror Tactics:

**A Review Of Imperial Hubris: Why The West Is Losing The War on Terror**
**By MARK S. ZAID**

----

Friday, Oct. 15, 2004

Anonymous, Imperial Hubris: Why the West is Losing the War on Terrorism (Brassey's Inc., 2004)

Al Qaeda will attack the continental United States again. Its strike will be far more destructive than that witnessed on September 11, 2001. It may even include weapons of mass destruction.

Or so we are told, repeatedly, by the recent book Imperial Hubris: Why the West is Losing the War on Terrorism. Indeed, the author is at times so pessimistic that he notes there may not be an opportunity for any errors in his book to be corrected, if the U.S. government continues to underestimate Osama bin Laden.



According to the author, "Anonymous," the problem with the existing war against terrorism is that "U.S. leaders refuse to accept the obvious: We are fighting a worldwide Islamic insurgency -- not criminality or terrorism -- and our policy and procedures have failed to make more than a modest dent in enemy forces."

The author is self-admittedly driven by anger and frustration over what he believes are the government's missed opportunities for dealing with the al Qaeda threat, and its basic misconceptions as to how to do so. Not everyone will have the stomach for his tough analysis -- and politically correct politicians, in particular, may shy away. But anyone who has an interest in the debate surrounding how to address these problems must read this book.

Even more interesting than the book itself, however, is the fact that it was allowed to be published in the first place.

## The Book's Central Argument: We Are Losing the War on Terror

To understand why publication was so unlikely - and surprising - in this case, it is important first to summarize the book's basic contentions relating to the war on terror.

To begin, "Anonymous" believes that even the mass killing of "our Muslim foes" will be simply insufficient for the West to prevail in the war on terror. Also necessary will be destruction of infrastructure reminiscent of General Sherman's Civil War raid on Atlanta - which will result in heavy U.S. military, and innocent foreign civilian, casualties.

"Anonymous" also contends that the American people must get beyond their increasing fixation with individual U.S. military deaths. Our military, he points out, are professional soldiers who must go where they are needed, and die if necessary.

Additionally, "Anonymous" condemns the Bush Administration's decision to invade Iraq in 2003, and lambastes policy officials for trying to create a Western-style democracy in Afghanistan.

Finally, he contends that it is a grave mistake for senior government officials to argue "that Muslims hate and attack us for what we are and think, rather than for what we do." It is U.S. actions, he argues, that draw wrath - not American freedoms.

**Who Is "Anonymous"? We Now Know**

Who is this mysterious author with such a harsh outlook?

The publisher's Website still describes him only as "a senior U.S. civil servant with nearly two decades of experience in the U.S. intelligence community's work on Afghanistan and South Asia." In addition, an initial press release noted that the "U.S. government agency at which this author is employed required that 'approval for this manuscript is predicated upon the author maintaining his anonymity and also that his association with the Agency is not disclosed.'"

But now the author's identity and employer are no longer a secret. Several media outlets identified him as Michael Scheuer - a 22 year veteran (overt, not covert) analyst employed by the CIA. Scheuer - who formerly served as the Station Chief for the CIA's Bin Laden desk - unquestionably knows his subject matter.

Why was Scheuer anonymous in the first place? The reason is not clear.

Initially, the CIA suggested Scheuer himself requested anonymity, particularly because of an alleged risk of making him an al Qaeda target. But in fact, it turns out that Scheuer never wanted to be anonymous. Although Scheuer had published an earlier book also as "Anonymous", nevertheless, that still begs the question why?

**Why Did the CIA Allow Scheuer to Publish This Book, Even Anonymously?**

But there's an even larger mystery: Why did the CIA allow such a controversial work to be published in the first place? In the book, a current CIA employee openly criticizes the actions of the then current CIA Director and a White House already under siege by the American public for its counter-terrorism policies.

If it had chosen to, the CIA could have easily blocked publication. Every CIA employee, in order to obtain employment, must execute a secrecy agreement pledging not to disclose classified information. The agreement contains a very specific pre-publication review clause that requires the submission of all writings (and oral presentations) that bear any relation to the work undertaken by the individual or their employer. This requirement extends into perpetuity. Breaching the agreement can trigger both civil and criminal penalties.

The CIA has historically sought to unabashedly stifle criticism stemming from former agency employees, whether the information was classified or not.

Even former CIA Directors have fallen victim. In dealing with his book, Secrecy and Democracy, Admiral Stansfield Turner described the process as arbitrary and irresponsible. He charged that the CIA tried to censor portions because of his "book's highly critical view of the Reagan administration's mishandling of our intelligence activities, especially its indifference to any oversight of the CIA."

Former CIA officer Frank Snepp has also experienced the CIA's wrath. Snepp wrote the best-selling book Decent Interval on the Vietnam War, which was published without having undergone prepublication review. Though the CIA claimed the book did not contain classified information, it successfully sued Snepp all the way to the Supreme Court.

In the Court's decision in *Snepp v. United States*, Snepp was found to have violated his contractual obligations under the terms of his secrecy agreement. Nearly thirty years after the book was first published, every royalty check Snepp earns is turned over to the U.S. government.

So exactly how did Scheuer get his book published?

Given his book's topic, there is no question that Scheuer was required to submit his manuscript for prepublication review. According to the CIA, the manuscript did not contain classified information.

But the analysis does not stop there for current employees like Scheuer. The regulations state clearly that "For current employees and contractors, the Agency may also deny permission to publish statements or expressions of opinion that could reasonably be expected to impair the author's performance of duties, interfere with the authorized functions of the CIA, or have an adverse impact on the foreign relations or security of the United States."

Thus, there is simply no question that the CIA could have prevented the publication of Scheuer's book if it had wanted to do so. And no court would have sided with him until perhaps after he had left the Agency's employ. Even then, the CIA could have delayed publication by years.

Why then did the CIA allow this manuscript to be published? Perhaps because it was the very message some senior CIA officials wanted public after having failed with any effect to convey similar messages privately.

**Following Publication The CIA Reverses Its Position**

Before and during a period after the book came out, Scheuer was routinely interviewed by the major newspapers and magazines, published op-eds and even appeared on television news interviews (of course while in shadow). The publicity led the book to reach Number 2 on *Amazon.com* and make the bestseller lists of the *New York Times* and *Washington Post*.

By August 7, 2004, though, the CIA changed its tune. Suddenly, Scheuer was required to secure advance permission for any interview; had to submit an outline of intended remarks; and was prohibited from responding to questions regarding intelligence reform. These restrictions are nothing out of the ordinary for current CIA employees. Yet the sudden shift of policy invites questions over whether, at this point, Scheuer had outlived his usefulness to the Agency.

No doubt the CIA was not happy with the contents of a July 31, 2004 letter Scheuer wrote, which was leaked to the press. In the letter, Scheuer harshly rebuked the conclusions of the 9/11 Commission, as well as the CIA itself. Indeed, he complained of failures by ''bureaucratic cowards'' in the intelligence agencies. He also expressed particular anger that no one had been held directly accountable for September 11th.

**Whose Agenda Did The Book Serve?**

The criticisms and recommendations presented by Scheuer, who is now considering leaving the CIA, are intelligent and, at times, frightening. Indeed, they are more widespread within the intelligence community than many wish to admit. Only time will tell whether the two primary questions arising from the publication of <u>Imperial Hubris</u> will ever be answered. Should the U.S. government heed Scheuer's advice in order to win the war on terror? And for what hidden purpose did the CIA, which never does anything that does not advance its own private agenda, allow a current employee to publish such critical and controversial comments just months before a presidential election?

---

*Mark S. Zaid is the Managing Partner in the Washington, D.C. law firm of Krieger & Zaid, PLLC. He specializes in national security, FOIA and First and Fifth Amendment litigation, and is the Executive Director of The James Madison Project (www.jamesmadisonproject.org), a non-profit organization that seeks to reduce secrecy and promote government accountability. He is currently working on a book detailing the historical perspective of the U.S. government's abuses of secrecy.*

[FILE /includes/writ/writ.news.findlaw.com/includes/right.shtml NOT FOUND]

Company | Privacy Policy | Disclaimer                    Copyright © 1994-2008 FindLaw

# EXHIBIT "2"

MORI DOCID: 1511250

UNCLASSIFIED

(b)(2)
(b)(3)

UNCLASSIFIED

**Date:** 09/09/2005

**Category:**   10 - Security       **OPR:** SC

**Title:**   AR 10-1    (U) SECURITY CLEARANCES, ACCESSES, AND APPROVALS

---

REVISION SUMMARY:  09 September 2005

This regulation supersedes AR 10-1, dated 23 March 2005.

AR 10-1 is revised to update organizational titles.  This revision reflects the Agency's organizational restructuring that resulted from the D/CIA's decision, effective 4 January 2005, to abolish the Mission Support Offices and establish the Directorate of Support.  This revision also reflects the title change for the External Operations and Cover Division in the Directorate of Operations to the Global Deployment Center.

*Boldfaced text in this regulation indicates revisions.*

---

*This regulation was written by the Security Center (SC) /Security Policy Staff*

**1.  (U)  SECURITY CLEARANCES, ACCESSES, AND APPROVALS**

**(U)  SYNOPSIS.  This regulation sets forth the authority and policies governing CIA security clearances, security approvals, and access approvals.**

a.  **(U)  AUTHORITY.**  The authority for this regulation is contained in the National Security Act of 1947, as amended; the Central Intelligence Agency Act of 1949, as amended; Executive Orders 10450, 12333, 12958, and 12968; Director of Central Intelligence Directive No. 6/4; and other applicable law.

b.  **(U)  DEFINITIONS.**  For purposes of this regulation, the following definitions apply:

(1)  A **"security clearance"** is a formalization of a security determination that an individual is authorized access, on a "need-to-know" basis, to a specific level of classified

APPROVED FOR RELEASE
DATE: JAN 2008

information (that is, TOP SECRET, SECRET, CONFIDENTIAL).

(2) An **"access"** or **"access approval"** is a formalization of a security determination that an individual is authorized access, on a "need-to-know" basis, to a specific type of classified information, such as Sensitive Compartmented Information (SCI), that imposes safeguarding and access requirements that exceed those normally required for information at the same classification level.

(4) A **"security approval"** is a security determination that is more restrictive in scope than a security clearance or access.  A security approval only grants authorization on a need-to-know basis to an individual for access to specific Agency activities, information, or facilities at a specified classification level for a specific purpose.  Security approvals generally apply to non-staff personnel, contractor personnel, service-type personnel requiring facility access, liaison contacts, and authorized contacts with persons who may be able to provide information of interest to the Agency.

(5) The term **"Operating Official"** has the same meaning as specified in AR[        ]but also includes "Heads of Independent Offices" as also identified in[        ]

c.  **(U//FOUO)  POLICY**

(1) All individuals employed by, affiliated with, or utilized by the Agency, excluding persons requiring operational approvals ([                                    ]must possess a security clearance, security approval, or access approval consistent with the sensitivity of the proposed use.  The C/SC, or designee is responsible for granting or determining eligibility to receive CIA security clearances, accesses (to include SCI access approvals), and security approvals to individuals under the security cognizance of the Agency.

(3) Individuals who do not have a need-to-know classified information and who are unlikely to be exposed to classified information during the course of their official duties (for example, groundskeepers, certain visitors to Agency premises,  and so forth)  may receive

UNCLASSIFIED

a limited FAA from the SC (see paragraph g of this regulation for a description of a full FAA).[2]

[2]The SC may grant limited FAAs to individuals who require escorted access to Agency buildings on a recurring basis. The SC Security Protective Service (SPS) may grant individuals (for example commercial delivery personnel) access to Agency premises on a non-recurring basis without additional SC coordination or approval. Investigations for Limited FAAs and escorted access granted by the SPS will be limited to examining federal, state, and local records as permitted by law. The limited investigations associated with these types of authorizations are conducted for the protection of Agency personnel and property rather than to determine eligibility to receive access to classified information. Denials of limited FAAs or SPS visitor requests are not subject to appeal under AR [    ] or any other Agency regulation.

(4) SC policies for the acceptance of security clearances and access approvals granted by other federal agencies and departments will be consistent with standards for the reciprocal acceptance of access eligibility determinations established by Executive Order 12968.

(5) The Agency does not discriminate on the basis of race, color, religion, sex, national origin, disability, age (40 and over), or sexual orientation in granting, denying, or revoking security clearances, accesses, or security approvals.

(6) The SC will not approve an individual for access or continued access to classified information if the individual, a member of the individual's immediate family as defined in DCID No. 6/4, or an immediate family member of the individual's spouse or cohabitant as defined in DCID No. 6/4, has ever been affiliated with the intelligence service or security service of a foreign country.

(7) The SC will not approve an individual for access or continued access to classified information if the individual's spouse or cohabitant is a foreign national currently employed by a foreign government unless the spouse or cohabitant resigns such foreign government employment. If the spouse or cohabitant is a U.S. citizen working for a foreign government, the SC will determine on a case-by-case basis whether resignation of the foreign government employment is a necessary precondition for the individual to be considered for access or continued access to classified information.

d. (U) **ADJUDICATIVE GUIDELINES AND INVESTIGATIVE STANDARDS USED BY CIA.** The investigative standards and adjudicative guidelines used by CIA for granting, denying, or revoking security clearances, accesses, and approvals are those national standards and guidelines approved by the President in accordance with Executive Order 12968. These guidelines and standards are set forth in DCID No. 6/4 and are hereby incorporated into this regulation.

e.

f. (U) **NON STAFF-LIKE ACCESS.** The clearance level (that is, TOP SECRET, SECRET, CONFIDENTIAL) and/or other access approvals granted for non-staff-like access will be consistent with the sensitivity of assigned duties, the information accessed, and/or the facilities which house sensitive information. As deemed appropriate, C/SC or designee may

UNCLASSIFIED

UNCLASSIFIED

require completion of more stringent investigative requirements than required by the applicable Government-wide investigative standards, including the use of the polygraph. In some cases, due to the sensitivity of certain operations, a SC security approval at or below the SECRET level may be required <u>before</u> contacting individuals who will be requested to perform services for the CIA.

j.  **(U)  DELEGATIONS OF AUTHORITY.**  The C/SC is the senior Agency official designated under section 6.1 of Executive Order 12968 to direct and administer the Agency's personnel security program.  The C/SC is delegated all authority granted by Executive Order 12968 to the **D/CIA**, as head of the Agency, except for the functions and authority set forth in sections 2.4(b) and 5.2(b), (d), and (e) of the Order which must be exercised by the **D/CIA**, or the **DD/CIA** acting on the **D/CIA**'s behalf.

k.  **(U)  AUTHORITY TO REINVESTIGATE, DENY, SUSPEND, REVOKE, OR ADMINISTRATIVELY TERMINATE SECURITY CLEARANCES, ACCESS APPROVALS, AND/OR SECURITY APPROVALS.**  The C/SC or designee may at any time deny a request for security clearance, access approval, or security approval.  The C/SC or designee may, at their discretion, initiate reinvestigations of an Agency employee or any other individual who holds an Agency-sponsored security clearance, access approval, or security approval to determine continued eligibility for such clearance, access, or approval.  The C/SC or designee may temporarily suspend an individual's security clearance, access

UNCLASSIFIED

MORI DocID: 1511250

UNCLASSIFIED

approval, or security approval during the investigation and until final adjudication of the individual's eligibility for access to classified information. Suspensions may not be appealed under this or any other Agency regulation. Upon completion of the reinvestigation or other inquiry, the C/SC or designee may revoke the individual's security clearance, access approval, or security approval if doubts remain regarding the individual's continued eligibility for security clearance, access approval, or security approval. Finally, the C/SC or designee may administratively terminate any Agency security clearance, access approval, or security approval when it is determined that the affected individual no longer requires the clearance, access, or security approval to carry out the individual's official duties. Administrative terminations may not be appealed under this or any other Agency regulation.

l.  **Not Used.**

UNCLASSIFIED

will provide Agency BI-related information to DSS. Unless otherwise directed, overt
employees should list the Chief, Human Resources as their supervisor. Overt and
covert employees must not list any other Agency personnel on the packet.

p. **(U) RESERVATION OF AUTHORITY.** Nothing in this regulation shall be deemed to
limit or preclude the **D/CIA** or the **DD/CIA** from taking any actions regarding an Agency
sponsored security clearance, access approval, or security approval with or without the
procedures set forth in this or any other regulation. In addition, neither this nor any other
regulation limits or precludes the **D/CIA** or **DD/CIA** from suspending, revoking, or
administratively terminating any individual's access to SCI, with or without procedures,
regardless of the individual's affiliation or lack of direct affiliation with the Agency.

q. **(U) NO ADDITIONAL RIGHTS CONFERRED.** Neither this nor any other Agency
regulation or policy statement creates for or confers on any person or entity any right to
administrative or judicial review of Agency security clearance, access approval, or security
approval determination procedures, their implementation, or decisions or actions rendered
there under. Also, neither this nor any other Agency regulation or policy statement creates or
confers any right, benefit, or privilege, whether substantive or procedural, for access to
classified information or facilities. Finally, neither this nor any other Agency regulation or
policy statement creates or confers any substantive or procedural right, benefit, or privilege
enforceable by any party against the Agency, any Agency instrumentality, or any Agency
officer or employee, or any other person acting for or on behalf of the Agency.

# EXHIBIT "3"

(b)(2)
(b)(3)

## UNCLASSIFIED

**Date:** 04/12/2005

**Category:**   10 - Security          **OPR:** SC

**Title:**   AR  10-16     (U) APPEAL OF PERSONNEL SECURITY DECISIONS

---

**REVISION SUMMARY:** 12 April 2005

This regulation supersedes AR 10-16, dated 16 May 2002.

AR 10-16 is revised to update organizational titles.  This revision reflects the Agency's organizational restructuring that resulted from the DCI's decision, effective 4 January 2005, to abolish the Mission Support Offices and establish the Directorate of Support.

*Boldfaced text in this regulation indicates revisions.*

*This revision was written by the Security Center,* _____

### 16.  APPEAL OF PERSONNEL SECURITY DECISIONS

**SYNOPSIS.  This regulation prescribes the policy and responsibilities for providing reviews and appeals to covered personnel who the CIA has determined are ineligible for access to classified information, in accordance with the adjudicative guidelines promulgated pursuant to Executive Order 12968, and for cases involving access to Sensitive Compartmented Information, incorporated into DCID No. 6/4.  Cases that involve the Agency's withdrawal of a conditional offer of employment or termination of employment for reasons other than ineligibility for access to classified information are *not* subject to appeal under this regulation, unless otherwise prescribed.**

**a.  AUTHORITY.** The National Security Act of 1947, as amended; the CIA Act of 1949, as amended; Executive Orders 12333, 12958, and 12968; DCID No. 6/4, and other applicable law.  The appeal provisions of this regulation shall apply notwithstanding any contrary provisions in the appeals annex to DCID No. 6/4.

**b.  DEFINITIONS**

(1)  **COVERED PERSONNEL.**   The terms "covered personnel" and "covered individual" refer to Agency applicants, (to include applicants for the summer employee program),

APPROVED FOR RELEASE
DATE: JAN 2008

**UNCLASSIFIED**

employees, and contractors, as defined in this regulation.[1]



[1] Pursuant to the National Security Act of 1947, as amended, and sections 1.1(e) and 5.2(e) of Executive Order 12968, the Director of Central Intelligence has determined that the following individuals will not be granted any appeal: (a) Assets, as defined in AR 20-73⬚;                                      , and (c) individuals other than applicants, employees, and contractors (as defined in b(2)-b(4) of this regulation) who are screened for approval for access to national security information and for whom the **Chief, Security Center** has determined an appeal cannot be granted consistent with the national security.

(2) **APPLICANTS.** For the purposes of this regulation, the terms "applicant" and "applicants" include individuals who have received conditional offers of employment to become Agency employees.

(3) **EMPLOYEES.** With the exception of [                              ] foreign national employees, for the purposes of this regulation, the terms "employee" and "employees" refer to staff personnel and non-staff personnel as defined in AR 20-2⬚, Categories of Personnel.

(4) **CONTRACTORS.** For the purposes of this regulation, the terms "contractor" and "contractors" include independent contractors (including consultants) and employees of contractors (also known as industrial contractors). The term "contractor" also includes, for purposes of this regulation, individuals from non-National Foreign Intelligence Board (NFIB) organizations for whom the Agency has denied or revoked a request for clearance and/or access(es).

c. **SECURITY AND SUITABILITY DETERMINATIONS**

(1) **GENERAL.** Cases that involve the Agency's denial or revocation of security clearances and/or access approvals of covered personnel are subject to appeal under the terms of this regulation. Cases that involve the Agency's withdrawing a conditional offer of employment or terminating employment for reasons other than ineligibility for access to classified information (for example, performance or surplus reasons) are *not* subject to appeal under Executive Order 12968, DCID 6/4, or this regulation. However, an employee involved in a "mixed case" (see paragraph h(2)(b) below) may appeal both security and employment suitability issues in accordance with this regulation.

(2) **APPLICANTS AND EMPLOYEES.** The **Chief, Security Center (SC)** or designee will determine whether an applicant's or employee's conduct raises concerns regarding suitability for employment, security eligibility, or both. However, in cases presenting only employment suitability issues, **C/SC** may only make recommendations regarding the individual's suitability for employment to the Chief, Human Resources (C/HR), the cognizant Head of Career Service, or their respective designees (see AR **13-8**⬚).

(3) **CONTRACTORS.** The **Security Center (SC)** is only concerned with a contractor's eligibility for a security clearance, access approval, or security approval as defined in AR 10-1⬚. The decision regarding an industrial contractor's suitability for employment is solely and exclusively the responsibility of the contractor's employer, not the Agency.

(4) **CONSULTATION.** In cases involving the possible denial or revocation of a security

**UNCLASSIFIED**

clearance or access approval where it is unclear whether the conduct involved raises solely security concerns or includes concerns involving an employee's suitability for employment, **the SC** will consult with the Office of General Counsel (OGC).

(5) **ADVERSE SECURITY DECISIONS**

    (a) With the exception of temporary suspensions or administrative terminations of access as defined in AR 10-1▣, whenever **the SC** determines that covered personnel are not eligible for access to classified information, the procedures set forth below shall apply unless the Director of Central Intelligence (DCI) or Deputy Director of Central Intelligence (DDCI) determines that the appeal procedures cannot be made available in a particular case without damaging the national security interest of the United States (U.S.)

    (b) Denials of waivers of adjudicative or investigative requirements as defined in AR 10-1▣, may not be appealed.

**d. INITIAL SECURITY DECISIONS**

(1) **APPLICANTS AND CONTRACTORS.** An SC officer delegated authority by the C/SC will make a decision to deny or revoke an applicant's or a contractor's security clearance and/or access approval(s).

(2) **EMPLOYEES.** The C/SC, usually after receiving the recommendation from the Personnel Evaluation Board (PEB), will make a decision to revoke an employee's security clearance and/or access approval(s). The C/SC will seek a recommendation from the PEB in cases involving staff personnel only. Detailed information concerning the PEB is set forth elsewhere in Agency regulations.

**e. STATEMENT OF REASONS; PROCEDURES ASSOCIATED WITH REQUESTING REVIEW OF AN INITIAL SECURITY DECISION**

(1) **APPLICANTS AND CONTRACTORS**

    (a) Consistent with national security and as otherwise provided by applicable law and this regulation, **the SC** shall provide an applicant or contractor with a comprehensive written statement of reasons (SOR) setting forth the basis for the initial security decision that the applicant or contractor does not meet the standard(s) for access to classified information.

    (b) The SOR shall inform the applicant or contractor that he or she may:

        (*1* )                                          Within 45 days of receipt of the SOR, r the initial security decision;

        (*2* )    At his or her own expense, use the services of counsel or another individual to act as a representative on the applicant's or contractor's behalf;

        (*3* )                               Request from **the SC** those documents, recor investigative file, upon which the initial security decision was based. (The applicant or contractor must make the request for documents at the time of his or her request for a review of the initial security decision. Within 30 days of

**UNCLASSIFIED**

**UNCLASSIFIED**

receiving the request, **the SC** shall provide the requested documentation in a manner consistent with national security and to the extent the documentation would be provided if requested under the Freedom of Information Act or the Privacy Act.); and

(*4*)     Request to appear, at his or her own expense, personally before an Agency representative identified to accept information regarding the applicant's or contractor's request for a review.  (The applicant or contractor must make the personal appearance prior to the review.)

(*a*)   The appearance shall be solely to present relevant documents, materials, and information for consideration by the designated review authority.

(*b*)   The Agency representative shall include a written summary of the appearance in the applicant's or contractor's security file for consideration by the designated review authority.

## (2) EMPLOYEES

(a) Consistent with national security and as otherwise provided by applicable law and this regulation, **the SC** shall provide an employee with a comprehensive written SOR setting forth the basis for the initial security decision that the employee does not meet the standard(s) for access to classified information.

(b) Within 10 days of receipt of the SOR, employees may reply in writing and request a review of the initial security decision.  If an employee's response would reveal classified information, it must be prepared and stored at a secure site acceptable to **the SC.**  Employees may also, within that 10 day period, request those documents, records, and reports, including the entire investigative file, upon which the initial security decision was based.  Within 30 days of receiving the request, **the SC** shall provide the documentation in a manner consistent with national security and as permitted by the Freedom of Information Act and the Privacy Act.  (For cases where the SOR or the associated documentation of the decision may be classified due to cover or other considerations, access to the SOR or documentation will be provided at a secure facility designated by **the SC** as though making a discretionary disclosure under the Privacy Act.)

(c) **The SC** shall advise employees in the SOR that they may, at their own expense, use the services of counsel or another individual to act as a representative on their behalf.  If an employee retains private counsel or a personal representative, the employee must obtain an Agency security clearance, access approval, or security approval for their personal counsel or personal representative prior to discussing any classified information with said counsel or representative.

(d) Employees may request to appear personally with counsel or their personal representative before an Agency representative identified to accept information regarding the employee's request for a review.  (The employee must make the personal appearance within 10 days of receipt of the SOR and prior to the review of the initial security decision.)

**UNCLASSIFIED**

UNCLASSIFIED

*(1)*    The appearance shall be solely to present relevant documents, materials, and information for consideration by the designated review authority.

*(2)*    The Agency representative shall include a written summary of the appearance in the employee's security file for consideration by the designated review authority.

*(3)*    The requirement that an individual stationed outside of the Headquarters area pay travel expenses associated with a personal appearance will be waived for Agency employees and detailees. These individuals will be provided with transportation to headquarters and appropriate lodging and subsistence expenses needed to make a personal appearance. All other costs incurred by these individuals as part of the review of the initial security decision are not reimbursable.

**f.  REVIEW OF INITIAL SECURITY DECISIONS**

(1) **REVIEW OF INITIAL SECURITY DECISIONS. The C/SC** shall designate an SC officer, other than the officer that made the initial revocation or disapproval decision, to review initial security decisions regarding applicants and contractors, when such a review has been requested by the applicant or contractor. For employees, the **C/SC** will review the initial security decision after the personal appearance has occurred or, where an employee does not request a personal appearance, after receipt of the employee's request for review of the initial security decision.

(2) **NOTICE OF RESULTS OF REVIEW. The SC** shall provide covered personnel, who have requested and received a review of an initial security decision by one of the above designated review authorities, written notice of and the reasons for the results of the review. In addition, **the SC** shall provide covered personnel with the identity of the deciding authority, consistent with cover and other applicable security considerations.

**g.  APPEALS**

(1) **NOTICE OF APPEAL.** In the written notice of and reasons for the results of the review, **the SC** shall advise covered personnel that they may appeal the initial security decision (and the review) to an appeals panel. Applicants and contractors must file their appeal within 30 days of the receipt of the notice and results of the review of the initial security decision. Employees must file their appeal within 10 days of the receipt of the notice and results of the review of the initial security decision.

(2) **APPEALS PANELS**

(a) **Applicants.** The appeals panel will consist of a senior SC officer (who will serve as the chairperson) designated by the **C/SC**; the **C/HR**; and the deputy head of the office that seeks to employ the applicant.

(b) **Contractors.** The appeals panel will consist of the **C/SC** (who will serve as the chairperson), the Chief, Counterintelligence Center (Chief, CIC), and the head of the office that requested the use of the contractor. For non-NFIB cases, the appeals panel will consist of the **C/SC** (who will serve as the chairperson), the Chief, CIC, and the **C/HR**.

(c) **Employees.** For employees from outside the E Career Service, the appeals panel

UNCLASSIFIED

UNCLASSIFIED

will consist of the Agency Executive Director (EXDIR) (who will serve as the chairperson), the Associate Deputy Director for Operations for Counterintelligence (ADDO/CI), and the Head of the employee's Career Service. For employees within the E Career Service, the panel will consist of the EXDIR (who will serve as the chairperson), the ADDO/CI, and the head of the employee's office. An **SC** representative will attend the panel sessions as a nonvoting member and will advise the panel regarding security considerations concerning the employee.

    (d) **Alternates.** Voting members of Agency appeals panels may designate other senior Agency officials (Senior Intelligence Service or equivalent grade) to act as their alternates at an appeals panel meeting in the event the voting member will be unavailable to attend the panel meeting.

(3) **CONVENING OF APPEALS PANELS.** At the call of the appropriate appeals panel's chairperson, the panel will convene to review the appeal of a covered individual.

(4) **PARTICIPATION BY OTHERS IN APPEALS PANELS.** Any of the above-mentioned appeals panels may request that representatives of OGC, the Office of Medical Services, the Office of Equal Employment Opportunity, or any other appropriate Agency office, attend appeals panels as nonvoting members to provide expertise and advice. Covered personnel and their representatives will not attend meetings of the appeals panels.

(5) **DECISIONS OF APPEALS PANELS**

    (a) The decision of an appeals panel shall be in writing, and the Agency shall notify the covered personnel in writing.

    (b) Except as provided in paragraph g(5)(c) below, the decision of an appeals panel shall be final and conclusive.

    (c) Nothing in this regulation shall prohibit the DCI, in his sole discretion, from overturning an appeals panel's decision or from taking any other action regarding an individual's security clearance, access, or security approval as he deems appropriate. Covered personnel, however, may not appeal security decisions to the DCI.

**h. RELATIONSHIP BETWEEN SECURITY DECISIONS AND EMPLOYMENT**

(1) **APPLICANTS.** When the appeals panel upholds the security decision in a case involving an applicant, the applicant will not be hired. **The SC** will record the security decision in the applicant's security file, and HR will record the security decision in the applicant's personnel file.

(2) **EMPLOYEES**

    (a) **Security Cases.** When the appeals panel upholds the security decision in a case involving an employee, the EXDIR will terminate the individual's Agency employment pursuant to the terms of AR 13-8⬛. **The SC** will record the decision in the individual's security file, and HR will record the termination in the employee's personnel file.

UNCLASSIFIED

UNCLASSIFIED

(b) **Mixed Cases.** When an employee's case involves issues regarding both security and suitability for employment, the procedural processing of the case will proceed as set forth in this regulation (including paragraph h(2)(a) immediately above). The employee will be notified of and may simultaneously address the issues relating to both security and suitability for employment, and these issues will be addressed by the appeals panel. The appeal by an employee of a mixed case will be handled under this regulation rather than the appeal provisions of any other regulation.

(3) **CONTRACTORS.** When the appeals panel upholds the security decision in a case involving an industrial contractor, the Agency will advise the individual and may also advise his or her employer. Employment decisions following the denial or revocation of an industrial contractor's security clearance and/or access approval(s) are solely and exclusively at the discretion of the employer. When an appeals panel upholds the security decision in a case involving an independent contractor, the Agency will not retain the services of the contractor. In both cases, **the SC** will record the decision in the individual's security file.

(4) **DETAILEES.** When the appeals panel upholds the security decision in a case involving a detailee, the detailee will be reassigned to his or her parent organization, and **the SC** will record the decision in the individual's security file.

(5) **INDIVIDUALS AT NON-NFIB ORGANIZATIONS.** When the appeals panel upholds the security decision in a case involving an individual who is at a non-NFIB organization and who is not physically assigned or physically detailed to the Agency, the Agency will advise the individual and his or her parent organization, and **the SC** will record the decision in the individual's security file.

**i.  DELEGATION OF AUTHORITY AND LIMITATIONS**

(1) **C/SC** is the senior agency official designated under section 6.1 of Executive Order 12968 to direct and administer the Agency's personnel security program.

(2) **C/SC** is delegated all authority granted by Executive Order 12968 to the DCI, as head of the Agency, except for the following provisions that must be exercised by the DCI or DDCI, acting on the DCI's behalf:

(a) **Section 2.4(b).** Making determinations regarding the sensitivity level of special access programs when considering access reciprocity;

(b) **Section 5.2(b).** Personally acting as the final appeal authority;

(c) **Section 5.2(d).** Denying covered personnel a particular appeal procedure under this regulation; and

(d) **Section 5.2(e).** Denying covered personnel an appeal under this regulation.

(3) This regulation applies only to individuals whose affiliation with the Agency requires that they undergo security processing to receive access to classified information. Time deadlines set forth in this regulation, other than those mandated by Executive Order 12968, may be extended or waived by D/OS or designee.

UNCLASSIFIED

**UNCLASSIFIED**

(4) Nothing in this regulation shall be deemed to limit or affect the authority of Agency personnel to make determinations with respect to an individual's suitability or availability for employment, assignment, or affiliation with the Agency.

(5) This regulation does not create for or confer on any person or entity any right to administrative or judicial review of these procedures, their implementation, or decisions or actions rendered thereunder. It also does not create or confer any right, benefit, or privilege, whether substantive or procedural, for access to classified information. Finally, this regulation does not create or confer any substantive or procedural right, benefit, or privilege enforceable by any party against the U.S., the Agency, or any other agency or instrumentality of the executive branch, its officers or employees, or any other person.

(6) Nothing in this regulation shall be deemed to preclude the DCI or the DDCI under the authority of the National Security Act of 1947, as amended, from taking any actions regarding a covered individual's security clearance or access, or employment with the Agency. The DCI or the DDCI may take any actions regarding an individual's security clearance, access, security approval, or employment with the Agency, without regard to any of the provisions of this or any other Agency regulation or DCI directive.

# EXHIBIT "4"

ADMINISTRATIVE - INTERNAL USE ONLY

(b)(2)
(b)(3)

ADMINISTRATIVE - INTERNAL USE ONLY

**Date:** 06/03/97

**Category:**   70 - Information and Records Management     **OPR:** OIM

**Title:**   AR 70-5     DECLASSIFICATION AND RELEASE

---

**PEN AND INK CHANGE:** 7 March 2001

On 18 August 2000, the Director of Central Intelligence Agency signed a delegation of authority giving the Deputy Executive Director authority to classify, declassify, and release Agency information.  The change is reflected in paragraph f(3) and are designated by bold text.

*This regulation was written by the Office of the Associate Deputy Director for Administration/Information Services,*

## 5. DECLASSIFICATION AND RELEASE

**SYNOPSIS. This regulation provides policy and guidance regarding the declassification[1] and release[2] of information that documents Central Intelligence Agency activities, and the activities of predecessor organizations (hereinafter "Agency information").**

[1] Declassification, as discussed in this regulation, refers to declassification carried out under the authority of Executive Order 12958.  Thus, declassification, in the context of this regulation, does not apply to imagery, since the declassification of imagery is carried out under the separate authority of Executive Order 12951.

[2] Release, in the context of this regulation, relates only to unclassified information.  Information which is classified and provided to authorized recipients outside of the Agency does not fall within the scope of this regulation.

ADMINISTRATIVE - INTERNAL USE ONLY

APPROVED FOR RELEASE
DATE: JAN 2008

ADMINISTRATIVE - INTERNAL USE ONLY

ADMINISTRATIVE - INTERNAL USE ONLY

MORI DocID: 1511295

ADMINISTRATIVE - INTERNAL USE ONLY



ADMINISTRATIVE - INTERNAL USE ONLY

ADMINISTRATIVE - INTERNAL USE ONLY

f. **RELEASE OF INFORMATION.** A decision to publicly release any Agency information (orally, or in electronic or written format) requires not only a declassification review, but also a review to determine whether the Agency has a legal obligation, or the discretionary authority, to claim other exemptions or legal privileges against the disclosure of such information. Thus, the authority to declassify Agency information is not synonymous with the authority to publicly release Agency information. The authority to release Agency information is restricted to the following persons as set forth below, and any previous delegations of release authority are hereby rescinded:

(1) The DCI, as the head of the CIA, has release authority with respect to all Agency information (including information under the cognizance of the statutory Office of the DCI) the disclosure of which is not precluded by law.

(2) The Deputy Director of Central Intelligence is delegated release authority with respect to all Agency information (including information under the cognizance of the statutory Office of the DCI) the disclosure of which is not precluded by law.

(3) The Executive Director **and Deputy Executive Director are** is delegated release authority with respect to all Agency information (except information under the cognizance of the statutory Office of the DCI) the disclosure of which is not precluded by law.

(4) The Deputy Director of Central Intelligence for Community Management/Executive Director for Intelligence Community Affairs is delegated release authority with respect to all Community Management Staff information the

ADMINISTRATIVE - INTERNAL USE ONLY

disclosure of which is not precluded by law.

(5) The General Counsel is delegated, consistent with DCI authority, release authority with respect to Agency information (including information under the cognizance of the statutory Office of the DCI) to be released to the courts, the Department of Justice, or otherwise in the conduct of the General Counsel's statutory responsibilities, when the disclosure of that information is not precluded by law.

(6) The Inspector General is delegated, consistent with DCI authority, release authority with respect to Agency information (including information under the cognizance of the statutory Office of the DCI) to be released to the Congress or otherwise in the conduct of the Inspector General's statutory responsibilities, when the disclosure of that information is not precluded by law.

(7) The Deputy Director for Administration, the Deputy Director for Intelligence, the Deputy Director for Operations, the Deputy Director for Science and Technology, and the heads of elements within the DCI Area are delegated release authority with respect to all Agency information within their functional responsibilities, when the disclosure of that information is not precluded by law.

(8) Deputy Directors and heads of elements within the DCI Area may delegate release authority to subordinate officials as necessary. Such delegations shall be in writing and sent to the Director of Information Management who will maintain a file of such delegations.

(9) The DCI Area IRO is delegated release authority for DCI Area information and each Directorate IRO is delegated release authority for information from that Directorate, when disclosure of that information is not precluded by law. The DCI Area IRO may release information within the functional responsibilities of an element within the DCI Area in coordination with that element or in accordance with mutually agreed upon procedures.

(10) Deputy Directors and heads of elements within the DCI Area (or their designees) have the authority to authorize the release of material received from a current CIA employee that is intended for nonofficial publication when consistent with the standards of review required by **AR 6-2** 🗎 .

(11) The DCI has designated the DDA as the "senior agency official" within the meaning of section 5.6 of Executive Order 12958. As such, the DDA has further delegated to the Director of Information Management (D/IM), as both the classification system manager for CIA and the Agency Information Review Officer, release authority with respect to material denied by the Agency on initial information requests, when that material is unclassified or has been declassified and the Agency does not claim any exemption or privilege from disclosure.

(12) The Director of Congressional Affairs is delegated release authority with respect to Agency information (including information under the cognizance of the statutory Office of the DCI) to be released to Members of Congress, or Congressional committees, or Congressional staff, when that information is unclassified or has

ADMINISTRATIVE - INTERNAL USE ONLY

been declassified and the Agency does not claim any exemption or privilege from disclosure.

(13) The Director of Public Affairs is delegated release authority with respect to Agency information (including information under the cognizance of the statutory Office of the DCI) to be provided to the media that is unclassified or that has been declassified and for which the Agency does not claim any exemption or privilege from disclosure.

(14) The Information and Privacy Coordinator is delegated release authority with respect to Agency material (including material under the cognizance of the statutory Office of the DCI) responsive to Freedom of Information Act, Privacy Act, and Executive Order Mandatory Declassification requests, when that material is unclassified or has been declassified and the Agency does not claim any exemption or privilege from disclosure.

(15) The Director of the Center for the Study of Intelligence (D/CSI) is delegated release authority with respect to 25 year old permanent Agency material exempt from automatic declassification, Agency material that is part of the Historical Review and Publications programs, Agency information requested by the Department of State for the Foreign Relations of the United States Series, and Agency materials provided as part of academic outreach programs under the purview of the D/CSI, when that information or material is unclassified or has been declassified and the Agency does not claim any exemption or privilege from disclosure. The Chief, Historical Review Group is delegated release authority, to be exercised on behalf of the D/CSI, for Agency information and material that has been reviewed for systematic declassification, when that information or material is unclassified or has been declassified and the Agency does not claim any exemption or privilege from disclosure.

(16) The Automatic Declassification Program Manager is delegated release authority with respect to 25 year old or older permanent Agency records, not exempt from automatic declassification, when those records are unclassified or have been declassified and the Agency does not claim any exemption or privilege from disclosure.

(17) All Agency focal point officers appointed by the EXDIR or D/IM for a special search are delegated release authority with respect to Agency information (including information under the cognizance of the statutory Office of the DCI) responsive to that special search, when that information is unclassified or has been declassified and the Agency does not claim any exemption or privilege from disclosure.

(18) The D/IM is delegated exclusive authority (except as otherwise specifically set forth in this subsection) to publicly release or otherwise disclose to anyone outside the Agency all Agency-wide regulatory issuances; provided that no Agency-wide regulatory issuance may be publicly released or otherwise disclosed by the D/IM unless it has first been reviewed for release or disclosure by the Office of Primary

ADMINISTRATIVE - INTERNAL USE ONLY

Responsibility (OPR) and the appropriate IRO. Any decision by the D/IM whether or not to publicly release or otherwise disclose to someone outside the Agency an Agency-wide regulatory issuance may be appealed by the OPR or IRO to the DDA, the Executive Director, the DDCI, and, if necessary, to the DCI. The delegation of this authority to the D/IM does not divest the DDA, the Executive Director, or the DDCI of their authority to publicly release or otherwise disclose Agency-wide regulatory issuances, subject to DCI appeal, or the DCI of his authority to make such releases or disclosures. Any Agency-wide regulatory issuance that has previously been publicly released may be publicly released or otherwise disclosed to someone outside the Agency by the OPR or the appropriate IRO without obtaining D/IM approval.

(19) **AR** [ ] provides further detail on specific categories of unclassified Agency information where approvals may or may not be required prior to release. It also provides further detail on when employees may be in contact with persons or groups outside of CIA for the purpose of releasing unclassified Agency information. It is expected that consideration of particular release or contact approvals will be done in consultation or coordination with the designated IROs. Directorates or elements within the DCI Area may require, for information on certain topics, a higher level of approval for releases or contacts.

(20) All individuals authorized to publicly release Agency information are responsible for verifying prior to any release, through actual knowledge or consultation with the appropriate IRO or other Agency official with actual knowledge, that any information which they intend to publicly release is unclassified or declassified, and the Agency will not claim any exemption or privilege from disclosure.

(21) All individuals authorized to publicly release Agency information shall ensure, whenever they publicly release any Agency information in electronic or written format, that the information is provided to the manager of the Agency's database of released information in accordance with guidelines issued by the manager.

_____/s/_____
Acting Director of Central Intelligence

ADMINISTRATIVE - INTERNAL USE ONLY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|                                   |     |                                  |
|-----------------------------------|-----|----------------------------------|
|                                   | *   |                                  |
| THE JAMES MADISON PROJECT         | *   |                                  |
|                                   | *   |                                  |
| Plaintiff,                        | *   |                                  |
|                                   | *   |                                  |
| v.                                | *   | Civil Action No. 07-01382 (RMU)  |
|                                   | *   |                                  |
| CENTRAL INTELLIGENCE AGENCY       | *   |                                  |
|                                   | *   |                                  |
| Defendant.                        | *   |                                  |
|                                   | *   |                                  |

*    *    *    *    *    *    *    *    *    *    *    *

**RESPONSE TO DEFENDANT'S LOCAL RULE 7(h) STATEMENT OF**
**MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7.1 (h), the plaintiff respectfully responds to the defendant's

Statement of Material Facts as to Which There is No Genuine Issue.

1.  Plaintiff does not dispute this statement.

2.  Plaintiff does not dispute this statement.

3.  Plaintiff does not dispute the factual contents of the Central Intelligence Agency's

    letter dated July 4, 2007.

4.  Plaintiff does not dispute this statement.

5.  Plaintiff does not dispute the factual recitations of these statements in that the CIA

    identified particular components and databases as those which would be searched

    for responsive records, but does dispute any implied legal or factual

    characterizations or conclusions that those components and databases were most

    likely to have responsive records or were the only components or databases to

    contains responsive records.

6. Plaintiff does not dispute the factual recitations of these statements in that the CIA utilized specific search terms to conduct the search and that certain documents were retrieved, but does dispute any implied legal or factual characterizations or conclusions that the particular search terms rendered the search adequate or reasonable to locate all responsive records, or that additional search terms should not have been utilized.

7. Plaintiff does not dispute the factual recitations of this statement in that certain responsive documents were released in part, but does dispute any legal characterizations or conclusions regarding the applicability of FOIA exemptions or the segregability of information.

8. Plaintiff does not dispute this statement.

9. Plaintiff does not dispute the factual recitation of these statements in that another search was conducted, particular search terms were utilized, and additional documents were retrieved and released in part, but does dispute any legal or factual characterizations or conclusions that the particular search terms rendered the search adequate or reasonable to locate all responsive records or regarding the applicability of FOIA exemptions.

10. Plaintiff does not dispute the factual recitations of these statements in that the particular document was reexamined, that missing pages were located and released, and that no additional information from the document was released, but does dispute any legal characterizations or conclusions regarding the applicability of FOIA exemptions.

11. Plaintiff does not dispute the factual recitation of these statements in that the scope of the search was modified, but does dispute any legal characterizations or conclusions regarding the adequacy of the search.

12. Plaintiff does not dispute the factual recitation of these statements in that documents were retrieved, some were disclosed in whole or in part and others were withheld in their entirety, but does dispute any legal characterizations or conclusions regarding the applicability of FOIA exemptions.

Date:   July 14, 2008

Respectfully submitted,

/s/

_____
Mark S. Zaid, Esq.
DC Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
(202) 454-2809
(202) 330-5610 fax
Mark@MarkZaid.com
Brad@MarkZaid.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|                                          |   |                                   |
|------------------------------------------|---|-----------------------------------|
|                                          | * |                                   |
| THE JAMES MADISON PROJECT                | * |                                   |
|                                          | * |                                   |
| Plaintiff,                               | * |                                   |
|                                          | * |                                   |
| v.                                       | * | Civil Action No. 07-01382 (RMU)   |
|                                          | * |                                   |
| CENTRAL INTELLIGENCE AGENCY              | * |                                   |
|                                          | * |                                   |
| Defendant.                               | * |                                   |
|                                          | * |                                   |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>ORDER</u>

Upon consideration of plaintiff's Opposition to Defendant's Motion for Summary Judgment, and it appearing that the relief prayed is just and appropriate, it is this _____ day of _____ 2008,

ORDERED, that defendant's Motion is denied; and

FURTHER ORDERED, that the plaintiff is permitted to undertake limited discovery as set forth in the accompanying Memorandum Opinion.

_____
UNITED STATED DISTRICT JUDGE